**JANOVE PLLC**
Raphael Janove (SBN 361193)
raphael@janove.law
115 Broadway, 5th Fl.
New York, NY 10006
Telephone: (646) 347-3940

**JANOVE PLLC**
Liana Roza Vitale (SBN 348772)
liana@janove.law
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
Telephone: (805) 505-9550

***Attorneys for Plaintiffs and the Proposed Classes***

JANOVE PLLC
979 Osos St., Ste. A5, San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

LUCY YE, JULIA FLEMING, and JACQUELINE CLAY, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

UBER TECHNOLOGIES, INC.,

Defendant.

Case No. 4:26-cv-01744-KAW

**FIRST AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

Plaintiffs Lucy Ye, Julia Fleming, and Jacqueline Clay ("Plaintiffs"), individually, and on behalf of all others similarly situated, bring this class action suit for damages and equitable relief against Uber Technologies, Inc. ("Uber" or "Defendant"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves and on their own investigation, on the investigation of their counsel, or on information and belief as to all other allegations:

**NATURE OF THE ACTION**

1. Founded in 2009, Uber provides on demand rideshare services through its mobile application. Customers enter the address of their destination and then choose their desired ride.

2. Customers can pay extra for a precise arrival time (*e.g.*, "in 3 min") or else choose to "Wait & Save" for a ride that is promised to arrive within a range—for instance, in between four to fifteen minutes.

3. Uber will charge a premium price for a ride that is promised to arrive as little as *one minute* faster, because it knows that this difference is important to many Uber customers who seek faster and more predictable pickups.

4. But despite charging more for rides that are marketed as having faster and more predictable arrival times, these Uber rides frequently do not arrive when they are promised. Further, despite being advertised as "Faster" alternatives to the Wait & Save option, these rides often take as long as—*or even longer*—than a Wait & Save ride would take to arrive.

5. When customers pay more for a faster ride with a precise arrival time and those rides fail to arrive at the time advertised, Uber does not refund the unjustified price premium. Customers pay a price premium for nothing, unjustly enriching Uber at the consumer's expense.

6. Because of Uber's failure to provide rideshare services as advertised, Plaintiffs bring claims on behalf of themselves and all those similarly situated for violations of the Unfair Competition Law, Cal. Bus. & Prof. Code, §§ 17200, *et seq.* ("UCL"); The False Advertising Law, Cal. Bus. & Prof. Code, §§ 17500, *et seq.*("FAL"); the California Consumers Legal Remedies Act, Cal. Civ. Code, §§1750 *et seq.*, ("CLRA"); the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), Penn. Trade & Comm. Code, §§ 201-1, *et seq.*; the New York General Business Law, §§ 349 & 350 ("GBL"); and for unjust enrichment and fraud. In addition, Plaintiffs

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

bring declaratory judgment claims on behalf of themselves and all those similarly situated to invalidate Uber's unconscionable and unenforceable so-called "arbitration" clause.

**PARTIES**

7. Plaintiff Lucy Ye is a natural person and a California resident. On forty or so occasions within the past year, Ms. Ye paid extra for an UberX rather than choosing a lower-priced Wait & Save fare. Even though Ms. Ye paid a premium price to be picked up by a certain time, approximately twenty-five of these rides took longer than advertised to arrive. For example, on or around December 11, 2025, Ms. Ye paid for an UberX from Buckhead, Atlanta to the Atlanta International Airport. That ride was advertised as arriving in three minutes but, in fact, it took nearly ten minutes to arrive.

8. Plaintiff Julia Fleming is a natural person and a Pennsylvania resident. On at least eight occasions within the past two years, Ms. Fleming paid extra for an UberX rather than choosing a lower-priced Wait & Save fare. Even though Ms. Fleming paid a premium price to be picked up by a certain time, many of these rides took longer than advertised to arrive. For example, on or around October 22, 2024, Ms. Fleming paid for an UberX from a location on Laurel St. in Philadelphia to a drop off point elsewhere in Philadelphia. That ride took approximately 18 minutes to arrive, even though Uber marketed the fare as arriving sooner when Ms. Fleming chose her ride.

9. Plaintiff Jacqueline Clay is a natural person and a New York resident. On at least nine occasions within the past year, Ms. Clay paid extra for an UberX rather than choosing a lower-priced Wait & Save fare. Even though Ms. Clay paid a premium price to be picked up by a certain time, many of these rides took longer than expected to arrive. For example, on February 28, 2026 and March 28, 2026, Ms. Clay paid extra for UberX fares that arrived three to five minutes later than the promised arrival times.

10. Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business at 1515 3rd Street, San Francisco, California, 94158. At all times relevant herein, Uber conducted business in California, in the County of San Francisco, within this judicial district.

**JURISDICTION & VENUE**

11. This Court has subject matter jurisdiction under the Class Action Fairness Act,

979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Classes exceeds 100; and many members of the proposed Classes are citizens of different states than Defendant.

12. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201-02, and Rule 57 of the Federal Rules of Civil Procedure.

13. This Court has personal jurisdiction over Uber because it is headquartered in San Francisco, California and because a substantial portion of the events and conduct giving rise to Plaintiffs' claims occurred in California. Uber is headquartered in San Francisco, CA and, upon information and belief, key figures in Uber's corporate hierarchy and leadership team are located in San Francisco, including its Chief Executive Officer, Chief Financial Officer, Chief Marketing Officer and Senior Vice President of Communications & Public Policy, Chief Legal Officer and Corporate Secretary, Head of Delivery, Chief Product Officer, and Chief Technology Officer. Upon information and belief, Uber's Chief Business Officer is also located in San Francisco. Moreover, as of February 2026, Uber had 5,562 employees in the San Francisco Bay Area according to their LinkedIn profile.[1]

14. Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Uber resides in this district; and (ii) the conduct complained of herein occurred within this judicial district.

## DIVISIONAL ASSIGNMENT

15. Assignment to the San Francisco or the Oakland Division is proper under Civil Local Rules 3-2(c) and 3-2(d) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in San Francisco County.

## FACTUAL ALLEGATIONS

### I. Uber Promotes UberX as the "Faster" Option.

16. Uber provides on demand rideshare services through its mobile application. Users open the app, enter the address of their destination, and then choose their ride.

[1] https://www.linkedin.com/company/uber-com/people/?facetGeoRegion=90000084%2C102277331

17. Uber offers users various fare options. For instance, after selecting their pickup point and destination, consumers might be offered the following fares:




18. As shown above, UberX is displayed at the top of the list as the default option. (That is, the option is preselected, as indicated by the white ring encircling it.)

19. UberX is advertised as arriving at a precise time ("3 min") and is specifically advertised as "Faster" than Uber's other ride options. These claims are reinforced by the lightning bolt graphic, which conveys speed (as in, fast as lightning).

20. In contrast, Wait & Save is advertised with an estimated range of arrival times, and as the slower option—as indicated by the clock icon and text below stating, "Save $3.47 by waiting." So, in this instance, a customer would pay an extra $3.47 to be picked up faster by choosing UberX (or save that amount by choosing the slower Wait & Save fare).

21. Another exemplary fare screen is presented below. In this example, Wait & Save is listed as the third option, not the second but, in all material respects, this customer is presented with the same information. The UberX option is preselected, listed first, and advertised as the "Faster" option with a precise arrival time—here, a mere "2 min."



979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
115 Broadway, 5th Fl.
New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103




22. Uber differentiates arrival times to the minute, sometimes offering rides arriving in "2 min," "3 min," and "4 min" to the same consumer at once. In contrast, Wait & Save and Share rides are always advertised as arriving within an estimated range.

23. By describing some pickup times using exact numbers and others with estimates, Uber reinforces the idea that the advertised "Faster" arrival times for UberX are accurate. Uber could show arrival times for all of its services, including UberX, with an estimated range. But it chose not to, indicating to consumers that advertised arrival times—whenever they appear—are predictable and exact. Otherwise, there would be no way to distinguish between rides that are "2 min," "3 min," and "4 min" away.

## II. Uber Charges a Price Premium for "Faster" Pickup Times.

24. As demonstrated above, Uber markets the UberX option as "Faster" and more predictable, and charges customers more than the Wait & Save rate for these features.

25. In short, Uber always charges a premium for speed.

26. For instance, in the image shown below, the advertised arrival for UberX falls out of the Wait & Save advertised range by a single minute. Nonetheless, UberX costs over $3 more:




27. By differentiating between pick up times to the minute, Uber communicates that it can predict exactly when a driver will arrive and can reliably offer precise pickup times to its users.

28. This narrative is also repeated on Uber's website, which describes Wait & Save rides as an "Affordable" alternative.[2]

**III. Despite Creating the Impression Among Consumers that Arrival Times are Accurate, Exact, and Dependable, Drivers Often Fail to Arrive in the Time Advertised.**

29. The practices described above commonly create an expectation among Uber's customers that if they pay for a ride, they will be picked up by the advertised time. However, Uber often fails to deliver on its promise of accurate and faster arrival times for premium fares.

30. To illustrate, one customer ordered an Uber with an advertised pick-up time of four minutes. But after choosing the four-minute fare, the customer was told the driver was actually eleven minutes away. The customer's online post began with a question: "Anyone else notice the steep decline in accuracy of [Uber's] waiting times and arrival times?"[3]

[2] https://www.Uber.com/business/resources/product-updates/introducing-3-new-ride-options

[3] www.reddit.com/r/uber/comments/1ifnqmo/anyone_else_notice_the_steep_decline_in_accuracy/

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
115 Broadway, 5th Fl.
New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
115 Broadway, 5th Fl.
New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

r/uber • 1y ago
Equal_Beat_6202

**Anyone else notice the steep decline in accuracy of waiting times and arrival times?**

Never trusting their estimates again! So late for an event! The waiting time that showed first was 4 mins, then when confirmed, the driver was 11 mins away. What the frick? Then the route time estimate was also wrong, as if Uber doesn't know what traffic is. First world problem, I know. But still frustrating.

3 5 Share

31. It is notable that a GPS predicted arrival time is highly unlikely to change by such a substantial amount in such a short window of time, so this suggests Uber deliberately offers users arrival times that it knows it cannot provide in order to extract an unjustified price premium.

32. Around the same time, another customer complained about inaccurate arrival times, noting that his ride was advertised as arriving in six minutes but took twenty-four minutes to arrive.[4]

r/uber • 1y ago
SufficientComedian6

**How does this happen?**

As a frequent Uber user was wondering what drivers see on your side of the platform.

For instance: I'm requesting a pickup now. Uber app says 6 minutes so I select that option. The driver who came took 24 minutes and was actually driving in the opposite direction when they agreed to the ride. They continue to drive away, obviously doing another ride first.

Why is this okay? Why does that driver have the option to take my ride when they clearly aren't available to do it?

Another time an Uber delivery driver picked up my ride while in the process of making a delivery and was waiting for the recipient to get the package first. 15min later he's on his way to pick me up.

It's just getting extra frustrating to use the service. I'm not using "wait and save" or picking the cheapest option either. Thoughts??

33. Again, the fact pattern strongly suggests that Uber had no legitimate basis for the original arrival time that it advertised to the customer in order to charge a higher fare.

34. Just a few months ago, another customer complained more generally that they felt

[4] https://www.reddit.com/r/uber/comments/1ig7n92/how_does_this_happen/

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
115 Broadway, 5th Fl.
New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

"cheated" by Uber's advertised wait times; other customers shared their experiences in return.[5]


r/uber • 3mo ago
atp14

Only me, or do you also feel cheated after choosing?

Time estimates, time to pick up, and arrival time are totally erroneous. Maybe you went for an Uber option because you liked the time to pick up... but after they take your money, time is adjusted, adjusted and adjusted. Spoiler alert: technology to estimate arrival time within traffic is quite old.

2 8 Share


LordBowdon • 2mo ago

The number of times "6 minutes" becomes 26 minutes after drivers cancel and "searching for your ride" comes up again. Uber is now a dreadful company. I am driving myself to the airport where I know I can leave home at my chosen time and not be charged 3x the rate to come home.

1 Reply

35. As shown below, one of the users who commented on the post referenced above specifically said that a faster arrival time "was [that person's] criteria" for picking Uber over competitor service Lyft, and that they choose Uber—and chose to pay $32—because Uber said "the driver was 5 minutes away. But "[r]ight after" selecting the purportedly faster Uber ride the customer was told the driver was "11 minutes" out.[6]


atp14 OP • 2mo ago

All reasons are valid, but Uber just charged me 32$ after saying the driver was 5 minutes away. Proximity was my criteria, Lyft would take longer. Right after choosing, arrival time increased to 11 minutes. Before arriving, extra 3 and extra 2 minutes. As a customer I will love an operator that before charging me gives me a valid estimate of arrival. Are the operators unable to understand what is needed for this?

1 Reply

[5] www.reddit.com/r/uber/comments/1pf7zup/only_me_or_do_you_also_feel_cheated_after_choosing/

[6] *Id.*

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
115 Broadway, 5th Fl.
New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

36. Indeed, customers have complained for years that despite advertising faster arrival times for UberX, the actual arrival times are no faster than for Wait & Save.[7]

> **wafflemakers2** • 1d ago
>
> I dont Uber that often, but I always do wait and save when offered. Takes exactly the same amount of time as a regular ride.
>
> 2 Reply ···

> **sleeplessinseaatl** • 1d ago
>
> Wait and Save is a scam. The wait and save 'discounted' fare is the actual market fare. It allows them to increase the non wait and save fare by 10-15%. My friend is a PM at Uber. This is well known.
>
> 2 Reply ···
>
> **iHass** OP • 23h ago
>
> Exactly this.
>
> 1 Reply ···

> r/uber • 2y ago
> Artistic_One4886
>
> ## Wait times? What's changed?
>
> I used uber to send my teens to school in the morning. Their school no longer provides transportation so this is the best that I can do. Often times the wait is pretty steep. For instance they waited 20 minutes this morning when I selected Uber X. When in reality if the wait was still 20 minutes I just should have chosen wait and save versus paying the extra fee. In addition to school I also use Uber to take or pick my daughter up from work and an occasional pickup from football practice with my son. I always tip beforehand. I'm just a mom that works odd hours and I'm trying to provide transportation for my kids to get them to their destinations.

> How does Uber get away with this?... Every time, save for once, I've picked the faster ride Uber takes the higher price and immediately says my ride will not be there at the time I paid an extra buck or two but will be there when the "Wait and Save" car would have been there. Why not just ask if I want to pay a $1 to roll some dice? Also, why do I keep paying it? I guess because I keep thinking this time they mean it. How much extra money are they getting out of this? It has to add up

[7] www.reddit.com/r/uber/comments/1rcs7js/psa_order_a_wait_save_at_your_own_peril/; www.reddit.com/r/uber/comments/1f373gi/wait_times_whats_changed/; www.reddit.com/r/uber/comments/1f5y104/uberx_vs_wait_save/.

37. Notably, even the range that Uber advertises for Wait & Save may be wildly inaccurate.[8]

> r/uber • 2mo ago
> Substantial-Dig9995
>
> **What happened to uber?**
>
> Man I'm with out a car at the moment and been using uber lately. The wait and save is such a scam. Uber does straight lie to you and tell you there's a driver minutes away and then I end up waiting 20 minutes.

38. These testimonials show that, despite charging a premium price for purported faster and more predictable fares, Uber frequently (and knowingly) does not deliver.

## IV. Uber Admits It Has No Basis To Advertise Exact Arrival Times.

39. Although Uber's mobile application tells users they can pay more to receive a faster and more predictable arrival time, in other disclaimers that it knows consumers are unlikely to read, it admits that its advertised arrival times are not reliable.

40. So although there is no in-app disclaimer advising that arrival times are imprecise—and on the contrary, Uber in multiple different ways tells users they can pay extra to obtain faster and more reliable arrival times—deep in Uber's Help Page located on its website, in a post titled "How do ETAs work?," Uber states: "Please note that ETA times are estimates and not guaranteed. . . . This time estimates how long nearby drivers should take to arrive at your pick-up location."[9]

> **How do ETAs work?**
>
> Before a trip starts, your app provides an ETA for when your driver should arrive at your pick-up location.
>
> After your trip starts, your app provides an ETA for when you should arrive at your destination.
>
> Please note that ETA times are estimates and not guaranteed. A variety of external factors such as heavy traffic or road construction can impact travel time.
>
> Before you request a trip, your app displays a time near your pick-up location pin. This time estimates how long nearby drivers should take to arrive at your pick-up location.

[8] www.reddit.com/r/uber/comments/1q8t3zs/what_happened_to_uber/

[9] help.uber.com/en-GB/riders/article/how-do-etas-work?nodeId=6a4dbe13-0a86-4d11-a0ab-cc88f8171fb8

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

41. This page is technically accessible in the mobile app, but the placement is counterintuitive and requires multiple steps and scrolling through dense text to locate. Specifically, users must first find the Help page, which is not searchable in the app. Then, users must manually click through several sub-folders (Rides > Guides > Getting Started) before finding the page above. Even then, users must scroll for some time before finding the page—assuming they were even looking for this information in the first place. Even then, it is unlikely that users would have searched in the sub-folder named "Getting Started" when a sub-folder titled "From pickup to dropoff" is right below. That latter folder is the far more intuitive placement for a page about arrival times.

42. These disclaimers do nothing to mitigate the false advertising in Uber's mobile application.

43. Further, the disclaimer itself is deceptive because although it flags that the arrival times are estimates and so may be imprecise, it implies that Uber is making a good faith effort to provide the most accurate arrival times. This is clearly not the case, for the reasons demonstrated above and below.

44. In fact, the frequent inaccuracies in Uber's advertised fares do not appears to be caused by "external factors such as heavy traffic or road construction," but rather by Uber's deploying an arrival time prediction model that is designed to increase Uber's profits through deceptive marketing rather than provide the most accurate information to its customers.

45. Uber could choose to more accurately display ETAs for UberX as a range, just like it does with the Wait & Save and Share options. It chose not to.

46. The fact that Uber advertises Wait & Save and Share rides with a range makes its practice of advertising other ETAs with a precise time especially deceptive.

47. By differentiating its displays in this way, Uber implies that precise arrival times are more accurate or dependable than ranges. But all of Uber's advertised arrival times—range or not—are "estimates" and even those estimates are not made in good faith.

48. When it fails to deliver, Uber does not refund the difference consumers would have saved had they paid for Wait & Save.

49. Uber continues to mislead its customers in this way because, in aggregate, the

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

increased fees paid for UberX contribute to large profit margins.

50. In 2025, Uber had over two-hundred million (202,000,000) monthly active platform consumers who, collectively, took over thirteen and a half *billion* (13,500,000,000) trips.[10] If Uber took a $3 fee in one out of fifty rides, it would collect $810,000,000 in one-time UberX fees alone.

51. That figure is extremely conservative. If Uber charges $3 to be picked up one minute faster, it can—and does—charge far more for a greater advertised difference in pickup times. Moreover, Uber aggressively promotes UberX as a "Faster" option and preselects the option for every trip. Thus, annual revenue from UberX fees likely exceeds one billion dollars.

52. Uber benefits greatly from the false promise of a certain pick-up time even though it knows that it cannot reliably deliver on this promise.

**V. Advertised Pickup Times Are Calculated to Boost Profits.**

53. As shown above, Uber often differentiates between arrival times to-the-minute, often advertising arrival times of "2 min," "3 min," and "4 min" to consumers for different rideshare options. But, as Uber itself admits, these precise times are just estimates.

54. Upon information and belief, these advertised arrival times are not based on driver location or availability but, rather, are crafted to extract a price premium from consumers based on the false promise of a faster arrival time.

55. Uber has advertised different arrival times for different rideshares at different price points even when each option would take the same time to arrive. For instance, one Uber driver, in a location where he was "the only (online) driver for miles," tested this by opening the Uber app to call a ride. The driver found that his car—the only one for miles—advertised under three different price points. More interesting, however, were the advertised arrival times, "which differed for the

[10] https://investor.uber.com/news-events/news/press-release-details/2026/Uber-Announces-Results-for-Fourth-Quarter-and-Full-Year-2025/default.aspx

three classes of service by at least 2 minutes each." One was even labeled "Faster" than the others.


r/uber • 3y ago
[deleted]

**Is comfort faster to arrive than XL?**

In a location where Im the only (online) driver for miles, I sought a ride - from my own car about 20 yards from me.

comfort was X$, and X was Y$ and XL was Z$.

All are the same car (mine)

But more interesting was the expected arrival time, which differed for the three classes of service by at least 2 minutes each. Not only that, the comfort ride (in the same car as the X and XL car) was LABELLED faster.

I have to find this a wee bit deceptive. (I'm way more PRO uber than I am ANTI uber.)

56. Upon information and belief, Uber advertises different arrival times for rides based, at least in part, on factors unrelated to driver location or availability, and systematically underestimates the amount of time that it will take for drivers to arrive.

57. UberX is always advertised as "Faster" than Wait & Save and is always more expensive. Upon information and belief, Uber sets arrival times based, in part, to justify the price premium charged for its "Faster" UberX rides.

**VI. Uber Uses Other Coercive Tactics to Trick Riders into Paying More for UberX.**

58. In addition to the false claims detailed above, Uber uses several other manipulative tactics to induce consumers to choose UberX over other, less expensive, options.

59. First, Uber exploits what is known as the "marketing placebo effect" a phenomenon where people "tend to value expensive items over their cheaper counterparts."[11] Customers tend to prefer more expensive items because they think a higher price mitigates risk. Customers also believe expensive items are inherently higher quality. As one finance professor explained to the *Business Insider*, people are "more likely to pay more for something if they perceive a lower-priced product as giving lower satisfaction and a higher risk"[12]

60. Even though the difference between Wait & Save and UberX can be as negligible as

[11] https://www.businessinsider.com/sc/why-we-like-expensive-things-2018-12
[12] https://www.businessinsider.com/sc/why-we-like-expensive-things-2018-12



JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103
JANOVE PLLC

one minute according to Uber's representations, Uber knows that many consumers will pay an extra $3 or more to avoid the risk of getting picked up late.

61. Uber capitalizes on this association between price and dependability when, in reality, the precise arrival times advertised for an UberX ride are no more than "estimates" by the company's own admission.

62. In other words, Uber exploits the marketing placebo effect to mislead riders into believing that the higher priced UberX option is more likely to arrive without delay.

63. Second, Uber also uses coercive design tactics that the Federal Trade Commission calls "dark patterns"—deceptive practices used to manipulate consumers into making choices they would not ordinarily make.[13]

64. Uber uses dark patterns to induce consumers to choose UberX over other, less expensive options. These include dark patterns the FTC has identified and labeled as preselection, false hierarchy, and pressured upselling.

65. "Preselection employs the default effect cognitive bias—a psychological phenomenon where people tend to go with the option that is already chosen for them, even if there are other choices available."[14] Here, Uber preselects UberX every time users ask for a ride. So, Uber "preselect[s] a default that's good for the company, but not the user," thereby offering consumers an asymmetric choice.[15]

66. Uber also makes use of a false hierarchy and pressured upselling by always listing UberX first and highlighting this option in a bright-white box that stands in stark contrast to the app's all-black background.[16] Uber leverages the "contrasting visual prominence" and other elements of its user interface to focus attention and "steer users into making a certain selection," namely UberX over other options, like the cheaper Wait & Save.[17]

---

[13] *See* FTC Staff Report, *Bringing Dark Patterns to Light* at 2 (Sept. 2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf
[14] https://www.deceptive.design/types/preselection
[15] *See id*. at 25.
[16] *See* FTC Staff Report, *Bringing Dark Patterns to Light* at 23.
[17] *See id*. at 23.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

**PLAINTIFFS AND CLASS MEMBERS' CLAIMS ARE NOT ARBITRABLE**

67. Uber apparently believes it can escape accountability for this pervasive false advertising by forcing its customers to accept convoluted dispute resolution procedures that are transparently designed to deter and extinguish claims. But Uber's adhesive dispute resolution procedures are unconscionable and therefore unenforceable.

68. The so-called "arbitration" clause in Uber's US Terms of Use ("Terms"), last updated January 15, 2026, is "unworthy even of the name of arbitration." *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 688–690 (9th Cir. 2024). The process it imposes has nothing in common with the form of "[a]rbitration, as understood by Congress when it enacted the FAA," which "was designed to be a fair and efficient alternative to bilateral judicial proceedings." *Id.* at 690; *see also Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 657–58 (2022) (discussing "the norm of bilateral arbitration as [the Supreme Court's] precedents conceive of it").

69. Uber's dispute resolution process is not "bilateral," "individualized," or "informal." *Id.* at 656–57. Nor is it designed to be fair or efficient.

70. In fact, a careful review of the "arbitration agreement" shows that there is no agreement "to settle by arbitration a controversy" at all, which is yet another reason the FAA does not apply. *See* 9 U.S.C. § 2.

71. Rather, what the Terms actually require is a lengthy and onerous pre-dispute resolution process that claimants must follow as a "condition precedent" to asserting claims against Uber. But then the Terms provide that after forcing claimants through these various procedural hurdles, Uber can invoke a "Dispute Process" that, if successful, allows Uber to simply opt-out of arbitration and force claimants to start a new action in court.

72. Besides undermining the entire concept that there is any "agreement" to resolve disputes in arbitration, Uber's unconscionable process operates to delay filing or processing arbitration demands while running out applicable statutes of limitation.

**I. Consumers Are Surprised and Oppressed by Uber's Unconscionable and Unenforceable Dispute Resolution Provisions.**

73. Consumers are both surprised and oppressed by Uber's adhesive dispute resolution

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

terms. Uber's Terms contain no opt-out provision and are imposed on consumers in a procedurally unconscionable contract of adhesion.

74. No consumer would expect or understand the Terms' conflicting array of provisions concerning individualized arbitration and mass actions, or the surreptitious ways they work together to delay and impede claims—including by rendering claims time-barred while claimants try to navigate the Terms' labyrinthine dispute resolution processes, as detailed below.

## II. Uber's Notice Requirements and Pre-Dispute Resolution Procedure Are Unconscionable and Unenforceable.

75. According to Uber's Terms, before a consumers can assert any claim against Uber, they must follow an onerous "Pre-Arbitration Dispute Resolution and Notification" process.

76. The Terms require that before a consumer can bring claims in arbitration, the individual must comply with detailed notification procedures requiring consumers (but not Uber) to submit a notice of claim in hard copy (Uber can send notice of claims via email), and then "personally meet and confer, via telephone or video conference" with Uber. Terms § 2(d).

77. The meeting must be one-on-one: "Multiple individuals initiating claims cannot participate in the same informal telephonic dispute resolution conference." *Id*.

78. Consumers are required to "appear at and fully participate in the conference," even if they are represented by counsel. *Id*.

79. This requirement infringes on a consumer's right to be represented by counsel and to rely on their counsel's expertise and skill. And the vague requirement for individuals to "fully participate" in the conference (in addition to, and distinct from, merely appearing) is also void for violating legal ethical rules.

80. At these conferences, Uber's counsel—either directly, or by coaching Uber's agents, indirectly—are impermissibly allowed to communicate with a represented party. More than that, the rules seem to *require* Uber's counsel to do so: to "fully participate" in the conference, consumers must speak directly with Uber's attorneys' or else Uber's representatives (whose statements and guidance will obviously be directed by Uber's counsel).

81. Cal. Prof. Rule 4.2(a) states that "a lawyer shall not communicate directly or

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer."

82. This prohibition is read broadly. It prohibits any communication to Claimants when "the content of the communication to be had with the opposing party originates with or is directed by the attorney[.]" *San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 153 Cal. Rptr. 3d 583, 602 (Cal. App. 2013) (quoting Cal. St. Bar. Comm. Prof. Resp., CA Eth. Op. 1993-131). Uber's counsel is also prohibited from, *inter alia*, "scripting the questions to be asked or statements to be made in the communications or otherwise using the client as a conduit for conveying to the represented opposing party words or thoughts originating with the attorney." *Id.*

83. On information and belief, Uber's attorneys advised it to create this informal dispute resolution process, and has advised, or will advise, Uber's representatives on the "questions to be asked or statements to be made" at such a conference.

84. Thus, the dispute resolution process violates the ethical rules described above. *See San Francisco Unified Sch. Dist.*, 153 Cal. Rptr. 3d at 602.

85. Claimant's counsel has not consented to these requirements, and forcing consumers to agree to them in adhesive Terms is not permitted (as Uber has argued) simply because a Court has the power to order a party to appear personally at a mediation.

86. Nor is the requirement saved because the Terms allow that a "party's counsel may participate in the conference." Terms § 2(d). The fact remains that counsel may also not participate in the conference, but Uber still requires the claimant to attend and would then be speaking directly to a represented party in violation of ethics rules. Otherwise stated, it is not a claimant's counsel's obligation to attend the conference to keep Uber's counsel from violating ethical rules; it is Uber's obligation not to create this situation in the first place.

87. A claimant's failure to provide sufficient notice of claims, or to attend and "fully participate" in the required personal meeting, subjects any arbitration demand she may later file to immediate dismissal: "Engaging in an informal dispute resolution conference is a condition precedent that must be fulfilled before commencing arbitration, and the Arbitrator shall dismiss any arbitration demand filed before completion of an informal dispute resolution conference." Terms

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

§ 2(d).

88. Once a meeting has occurred, a consumer may finally initiate arbitration. However, the consumer must comply with additional one-sided notice requirements, including both mailing or serving a hard copy of the demand on Uber and emailing an "as-filed" copy of the arbitration demand to Uber, and emailing a copy of the arbitration demand to the applicable arbitration provider. Terms § 2(d). (Uber, by contrast, is only required to "send the written demand for arbitration to you via electronic email.") Failure to abide by these notice requirements can also result in dismissal of a consumer's claims.

89. Thus, Uber can further delay the resolution of the merits in arbitration by arguing that its vague and onerous Pre-Dispute Resolution procedures have been met. For instance, Uber can argue that a consumer did not "*fully* participate" in an informal dispute conference because it refused to answer certain questions or deferred to its counsel to respond to Uber's questioning. It is also implied but not directly stated that claimants should personally sign the demand for arbitration, opening the door for Uber to challenge any arbitration demand that is not personally signed by a claimant, in addition to being delivered to Uber in hard copy.[18]

**III. Uber's Unconscionable Tolling and Statute of Limitations Provisions.**

90. Notably, while the Terms provide that the "statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the informal dispute resolution process required by this paragraph," *i.e.* the personal "meet and confer" with Uber described in Terms § 2(d), the Terms provide for no other tolling.

91. In fact, buried in a provision titled "Rules and Governing Law" the Terms state: "All statutes of limitations that would otherwise be applicable will apply to any arbitration proceeding." Terms § 2(c).

92. So if a party commences an arbitration and Uber asserts that the claimant did not "fully participate" in the required personal meet and confer, the parties argue the point and the arbitrator ultimately dismisses the claim for having not satisfied this "condition precedent" to

[18] See Terms § 2(d) (describing how to commence an arbitration by requiring hard copy documents without discussing signatures, but then adding in the following paragraph: "By signing the demand for arbitration, you agree ….")

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

arbitration, Terms § 2(d), the statute of limitations runs throughout this process.

93. This is only one example of the multiple opportunities the Terms afford Uber to delay the processing or filing of arbitration claims while running out the statute of limitations to extinguish claims. The Terms' Mass Action protocol, discussed below, is another.

## IV. Uber's Mass Action Protocol Is an Elaborate Bait-and-Switch.

94. If a claimant successfully navigates the various procedural hurdles above, she next must contend with Uber's "Mass Action" protocols.

95. This protocol imposes a convoluted process that indefinitely delays any arbitration on the merits, all without the benefit of tolling. And at the end, the claimant may find that Uber has changed its mind about arbitration, and can now force the claimant to start anew pursuing her claims in court—if she still can.

96. The Terms never clearly explain this, but a careful reading makes this conclusion undeniable. It also makes clear that there is no "agreement" to resolve claims in arbitration, there is only a protracted process through which Uber may delay and impede claims, and then in the end opt-out of arbitration and demand that a claimant file a new proceeding in court.[19]

97. First, the Terms provide that disputes "shall be resolved only in individual arbitration." Terms § 2(a)(3)(a). Consumers "expressly waive the right" to have their claims against Uber heard "as a mass action, and neither an arbitrator nor an arbitration provider" has the authority "to administer any mass action or to award relief to anyone but the individual in arbitration." *Id.* (the "Mass Arbitration Waiver").

98. Thus, the Terms clearly disallow "mass actions," but the Terms' definition of mass action is so open-ended that almost anything can be argued to be a mass action. And claimants can neither predict nor control whether their claims will be part of a mass action and therefore suddenly become non-arbitrable. This vitiates any purported agreement to arbitrate—parties cannot agree to arbitrate in a shifting and undefined set of circumstances.

[19] Uber also openly admits this in its motion to compel, arguing that the "Mass Action Waiver ensures that either party can opt out of that type of arbitration-in-name-only [i.e. mass arbitration] while preserving mandatory arbitration for ordinary disputes." Dkt. 22 at 9. But there is no such thing as an agreement to arbitrate claims unless Uber decides that it doesn't want to arbitrate so many claims in which case it can opt out of arbitration.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

99. "[T]he definition of a "Mass Action" includes, *but is not limited to*, instances in which you or Uber are represented by a law firm or collection of law firms that has filed 50 or more arbitration demands of a substantially similar nature against the other party within 180 days of the arbitration demand filed on your or Uber's behalf." Terms § 2(a)(3)(a) (emphasis added).[20]

100. A "collection of law firms" that has filed "50 or more arbitration demands of a substantially similar nature" could mean 50 different claimants with 50 different counsel that all filed consumer protection claims against Uber. The "includes, but is not limited to" language renders the definition even more vague and ambiguous—for instance, perhaps claims do not need to be "substantially similar" but only "somewhat similar," or perhaps filing just twenty claims in a six-month period is sufficient, rather than fifty.

101. Uber can delay resolution of claims by making any of these arguments. And unlike claimants, who the Terms provide are subject to Rule 11 standards, the Terms impose no comparable requirement on Uber.

102. At a minimum, the mass action waiver appears to be triggered anytime multiple claimants are represented by the same counsel or multiple claimants file similar claims. Given the volume and frequency of Uber's misstatements about its ride times, and the fact that it provided over *13 billion rides* in 2025 alone, multiple similar claims are highly likely. Likewise, counsel with expertise in these areas is highly likely to represent other claimants.

103. Besides its failure to clearly specify in which conditions claims will proceed in arbitration, this provision is problematic because a claimant has no control over whether other claimants have filed similar claims or engaged the same counsel. So claimants are barred from proceeding in a mass arbitration, but also have no power to avoid a mass arbitration—the mass arbitration either exists or does not exist based on nebulous factors that are largely outside the claimant's control.

104. And, as noted above, the open-ended definition of a "Mass Action" means that Uber

[20] Existing claims can also retroactively, and through no fault of their own, be sucked into an impermissible mass action if similar claims are filed by other claimants within 180 days. Terms § 2(a)(3)(a); *see also* Terms § 2(a)(3)(c)(ii) (providing that mass arbitration procedures would apply to "further proceedings" for claims "originally processed as individual arbitration demands").

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103 JANOVE PLLC

can more freely dispute whether a claim violates the Mass Action Waiver, triggering a protracted review process.

105. The Terms provide that *whenever* an arbitration claim is filed, Uber can trigger a process misleadingly named a "Dispute Procedure."[21] Terms § 2(a)(3)(b). The Dispute Procedure involves a full review by an arbitrator (or panel of arbitrators). *Id*. This review has no set deadlines, rules, processes or procedures, but it will not conclude until the arbitrator(s) "issue a written decision with findings of fact and conclusions of law" concerning a single question: whether the claim at issue was filed as part of a Mass Action in breach of the Mass Action Waiver. *Id*.

106. Until this written decision is issued, an arbitration on the merits may not proceed and Uber may not be assessed any arbitration related costs or fees. *Id*.

107. Worse, at the end of all this, "[i]f the arbitrator or panel of arbitrators determines that any party has violated the Mass Action Waiver, the parties shall each have the opportunity to opt out of arbitration within 30 days of the arbitrator's or panel of arbitrator's decision." Terms § 2(a)(3)(b).

108. So a claimant does not know whether her claim is (or will become) part of a mass arbitration under the Terms' vague and open-ended definition. And even if a claimant could make an advance determination about whether her claim was part of a mass action, she has virtually no ability to avoid this result because she has no way to prevent other claimants from bringing similar claims.

109. Regardless, if the arbitration panel in the Dispute Procedure determines that her claim violates the Mass Action Waiver, Uber has the right to kick the claim out of arbitration and force the claimant to start anew in Court.

---

[21] The language of this clause is vague, providing that "the arbitrator shall be empowered to determine whether the party bringing any claim has filed a Mass Action in violation of the Mass Action Waiver," and that "[e]ither party shall raise with the arbitrator or arbitration provider such a dispute within 15 days of its arising." Terms § 2(a)(3)(b). A "dispute" in this context is not defined. Arguably, it would require a disagreement between the parties, but disagreement would be easy for Uber to manufacture simply by taking a position contrary to the consumer. Regardless, whether the issue can be raised unilaterally or requires some "dispute," Uber would have the ability to trigger the misleadingly named "Dispute Process," where in an arbitrator or panel of arbitrators renders "a written decision with findings of fact and conclusions of law" to decide whether the Mass Action Waiver has, in fact, been breached. *Id*. As explained, Uber has strong incentives to do so.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

110. Of course, since the Terms do not provide for tolling during the "Dispute Procedure," Uber can take advantage of the time wasted to argue that claims are now time-barred.

111. Thus, after forcing its users through multiple hurdles to even file an arbitration and have their claim processed, Uber can unilaterally stop any arbitration from proceeding by arguing that other claimants have filed substantially similar claims.

112. This is not a "written provision . . . to settle by arbitration a controversy," under the FAA, *see* 9 U.S.C. § 2. Claimants do not, and cannot, know in advance whether their claims will proceed in arbitration or be kicked out for violating the mass arbitration waiver, and it is unconscionable to force them to participate in this process when Uber may later opt-out of arbitration and force claimants to pursue claims in court.

113. In short, Uber can (i) contest any individual consumer's status as part of a Mass Action, (ii) benefit from the delay inherent in the protracted and open-ended Dispute Process, (iii) benefit from the stay of any further proceedings and a relief from its obligation to pay costs and fees, and (iv) once the Dispute Process concludes, simply opt-out of arbitration all together.

114. Further, if Uber's position is that it should be allowed to decide that it wants to exclude mass arbitration claims from arbitration while requiring other claims to be resolved there, it could simply require claimants who believe they may be part of a mass arbitration to notify Uber and provide for an opt out without the lengthy and unnecessary "Dispute Process."

115. The fact that Uber chose to impose this process is compelling evidence that its goal is to impose these so-called arbitration procedures as an inferior forum and a means to extinguish valid claims, and not to efficiently resolve disputes.

116. Finally, the opt-out provision is particularly unconscionable when the effect of forcing a consumer into court is properly considered. The Terms only contain a single tolling provision that operates to toll any "statute of limitations and any filing fee deadlines" during the pendency of the Pre-Arbitration Dispute Resolution and Notification process described below. But there is no provision for tolling the statute of limitations during the Dispute Process described above.

117. By the time Uber can opt-out of arbitration and force a consumer to sue in court, the applicable statute of limitations on the consumer's claims may have already run. In that case, Uber

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

would have leveraged the Terms to extinguish the consumer's right to any remedy in court.

118. For the same reason, the claimant's ability to "opt-out" of arbitration after investing substantial time and effort to reach this point is largely illusory because the claim may be time-barred if the claimant opts out and initiates court proceedings. And even if some claimants could still successfully pursue claims in court, it is unconscionable for Uber to force them to spend months or years trying to resolve claims in informal dispute calls and pointless arbitration proceedings first.

**V. The Mass Action Process Indefinitely Delays the Resolution of Claims A Consumer Tries to Arbitrate even if Uber Does Not Opt-out of the Arbitration.**

119. If a claimant feels forced to and Uber agrees to participate in the Mass Action grouping process it created, Uber can ask to appoint a Special Master "to resolve threshold disputes regarding the arbitration demands submitted in the Mass Action ("Mass Action Demands")." Terms § 2(a)(3)(c)(i).

120. As with the definition of "Mass Action" itself, the definition of "threshold disputes" is open-ended and vague.

121. As with the Dispute Process, there are no rules, procedures, or processes to guide the Special Master in the exercise of their authority. However, unlike in the Dispute Process where an arbitrator (or panel) consider(s) a single issue arising out of a single claim, a Special Master (*i.e.*, one person) must resolve issues raised by hundreds or perhaps thousands of claimants.

122. While no process, procedure or deadlines constrain the Special Master—or provide any guidance for their exercise of authority—there is a key limitation on the Special Master's power: they cannot decide issues for multiple claimants at once. The Special Master has no authority to address threshold issues on a collective basis because the Special Master has "no authority to consolidate cases." Terms § 2(a)(3)(c). Having one arbitrator individually decide so many issues will obviously delay resolution of claims.

123. As soon as a Special Master is appointed and so long as they preside over a Mass Action, the applicable arbitration provider may not process "any of the Mass Arbitration Demands to which a dispute has been raised."[22] Terms § 2(a)(3)(c). In addition, "[n]o further payment for

[22] The phrase "to which a dispute has been raised" is not defined but, presumably, refers to the

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

filing fees, administrative costs, or arbitrator fees shall be deemed due with respect to any of the Mass Arbitration Demands as to which a dispute has been raised until after the dispute(s) has/have been resolved by the Special Master." *Id*. The exception to this carve out are "fees and costs related to the proceedings before the Special Master" themselves. *Id*.

124. Although consumers are barred from filing new claims while a Special Master is appointed, there is no complementary provision tolling the statute of limitations. This means that if a consumer cannot file before a Special Master is appointed and the Special Master does not resolve all issues before the statute of limitations runs, then the consumer's claim is extinguished.

125. Appointing a Special Master denies claimants access to a forum and, in effect, may drastically shorten the limitations period. Claims could easily be time barred before the Special Master is even part-way through with the onerous task resolving threshold issues one-by-one.

126. Finally, if the Special Master completes this task, consumers and their counsel have just fourteen days (not business days) to organize claimants into groups of one hundred claimants. Each group of claimants is assigned "to a single arbitrator, with each group having one set of administrative documents, one set of administrative and filing fees per group, and one arbitration management conference per group." Terms § 2(a)(3)(c)(ii). Supposedly, these arbitrators have no authority to decide any issues collectively. "Regardless of the grouping described above, the arbitrator shall resolve all arbitrations within a group on an individual basis." *Id*. But there is no process to enforce this requirement. No rules, protocols or procedures contained in the Terms guide the arbitrator who presides over the batched groups. This lack of guidance is problematic in itself; the application of legal conclusions and rulings from previously decided arbitrations, may operate to provide Uber "many of the protections and advantages of a class action, but provide to [consumers] virtually none of its protections and advantages." *See Heckman*, 120 F.4th at 685.

---

process described in Section 2(a)(3)(b), where a "dispute" as to whether a claim was filed in a Mass Action triggers the Dispute Procedure discussed above. This implies that the appointment of a Special Master could prevent the applicable arbitration provider from processing *any* claim because Uber could easily manufacture a "dispute" as to any claim and trigger the Dispute Procedure. Note that Uber could do so even if, on its face, the claim had nothing to do with the pending Mass Action and could in no way be considered a part of the Mass Action. That is because the only apparent standard for triggering the Dispute Procedure is the existence of a "dispute" between the parties, or else, the Terms allow for any party to *sua sponte* trigger the Dispute Procedure. *Supra* note 18.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

127. Even at this stage, after having several opportunities to dispute whether consumers properly followed the notice procedures proscribed by the Terms, Uber can *still* "object that the filing or presentation of multiple arbitration demands" violates the terms. Terms § 2(a)(3)(c)(ii).

128. The near intractable delay imposed by the Mass Action protocols will not only apply to claims that were filed as part of a Mass Action. Any qualifying demands that "were originally processed as individual arbitration demands before this batching procedure was commenced, further proceedings, including the assessment of further arbitration filing or administration fees to either party shall be governed by the procedures" described above. Terms § 2(a)(3)(c)(ii).

**VI. The Delegation Clause is Also Unenforceable.**

129. Uber purports to insulate this entire process from judicial review with yet more convoluted and contradictory language in the Terms so-called "Delegation Agreement," which "delegates" certain threshold issues that would otherwise be decided by a Court to an arbitrator. Terms § 2(a)(4).

130. These conflicting provisions do not provide clear and unmistakable evidence of anything.

131. The "Delegation Agreement" first grants an arbitrator "exclusive authority" to determine whether the arbitration process is unconscionable:

> Only an arbitrator, and not any federal, state, or local court or agency, shall have *exclusive* authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or part of this Arbitration Agreement is void or voidable. An arbitrator shall also have *exclusive* authority to resolve all threshold arbitrability issues, including issues relating to whether these Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel. Terms § 2(a)(4) (emphasis added).

These portions are printed entirely in bold font.

132. However, in the next line, the Terms provides that "only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes concerning the Class Action Waiver and Mass Action Waiver, including, but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable,

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

unconscionable, illegal, void, or voidable[.]" Terms § 2(a)(4). This text is printed in normal font, not the bold type of the text above.

133. But two pages earlier in the Terms' "Dispute Procedure" section, Terms § 2(a)(3) discussed above, the Terms also state that as part of that process: "the arbitrator shall be empowered to determine whether the party bringing the claim has filed a Mass Action in violation of the Mass Action Waiver." However, such a dispute would clearly be a "dispute concerning the Mass Action Waiver," so under Terms § 2(a)(4) it must be resolved by "a court of competent jurisdiction."

134. This contradictory language does not amount to clear and unmistakable evidence of the parties' intent to delegate arbitrability issues. *See Tesla Advance Driver Assistance Sys.*, 2023 WL 6391477 at *6. Instead, there is an "inherent tension" in the contradictory delegations of authority to this Court and an arbitrator, the intended bounds of which are difficult to discern. *Id*.

135. In addition, the delegation clause is unenforceable for many of the same reasons discussed above. It is imposed on consumers in an adhesive and oppressive manner, and a claimant must jump through multiple hoops before it can even start an arbitration where this issue might be resolved. Even then, a claimant has no way of knowing in which dispute resolution process the delegated issues will supposedly be resolved. Instead, a claimant may waste months or even years trying to get the issue resolved by an arbitrator only to find that Uber has invoked the Dispute Process and opted out of arbitration and the "delegated" issues must now be resolved by a court.

136. For example, if several claimants argue that the Terms are unconscionable, Uber can invoke the Disputes Procedure, argue that the case has become a mass action in violation of the Mass Action Waiver because multiple claimants are advancing the same arguments, convince an arbitration panel to agree under the "including but not limited to" language in the definition of Mass Action, and then exercise its option to kick the claims out of arbitration and force claimants to start fresh in court. This is unconscionable.

## VII. Other Unconscionable Provisions

### a. The One-sided Class Action Waiver.

137. The Terms contain a "Class Action Waiver," that purports to waive a consumer's right to have any claim "resolved[] or arbitrated as a class, collective, coordinated, consolidated,

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

and/or representative action," and denies an arbitrator any authority to hear such an action or "to award relief to anyone but the individual in arbitration." Terms § 2(a)(2).

138. Yet, "[n]otwithstanding anything else in this agreement, this Class Action Waiver does not prevent you or Uber from participating in a classwide, collective, and/or representative settlement of claims." Terms § 2(a)(2).

139. So, Uber effectively bars claimants from using class action mechanisms to hold Uber accountable, but it retains for itself the right to negotiate a class-wide resolution of a consumer's claims, without that individual's participation, and thus to insulate itself from liability for similar claims.

**b. The Non-Mutual Exception to Mandatory Arbitration.**

140. The Terms allow claims for "injunctive or other equitable relief to prevent the actual or threatened infringement . . . of a party's . . . intellectual property rights" to be brought in court. Terms § 2(b). This provision allows Uber to avail itself of the judicial system to protect its intellectual property without being forced to go to arbitration.

141. Although facially neutral, this provision is transparently one-sided because although Uber may have a claim against a consumer for a violation of intellectual property rights consumers almost certainly will not have this type of claim against Uber.

**c. Limitations of Liability.**

142. The Terms contain an extensive and expansive Disclaimer, Limitations of Liability and Indemnity clause that work to further insulate Uber from consumer claims.

143. Uber disclaims any liability for consequential or indirect damages "even if Uber has been advised of the possibility of such damages." Terms § 8. Uber also disclaims any liability arising out of a consumers' "use or reliance on [rideshare] services or [consumers'] inability to access or use the services[.]" Terms § 8. Later, Uber reiterates that it "has no responsibility or liability to [consumers] related to any transportation . . . services provided to or not provided to" consumers by Uber's drivers. Terms § 8.

144. Finally, the Terms include a one-sided indemnification provision, whereby consumers "agree to indemnify and hold Uber and its affiliates and their officers, directors,

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

employees, and agents harmless from and against any and all actions, claims, demands, losses, liabilities, costs, damages, and expenses (including attorneys' fees), arising out of or in connection with" a consumer's use of Uber's rideshare service. Terms § 8.

**d. Asymmetric Waiver Provision.**

145. Buried at the very bottom of the Terms, in a section titled "General," Uber includes an asymmetric waiver provision: "Uber's failure to enforce any right or provision in these Terms shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Uber in writing." Terms § 10. There is no similar protection for consumers under the Terms.

**e. Asymmetric Rule 11 Requirements.**

146. The Terms also contain a long paragraph informing consumers that: "By signing the demand for arbitration, you agree to" comply with various Rule 11 type requirements. Terms § 2(d). No similar Rule 11 obligations apply to Uber's defenses or any other arguments that may be raised by Uber in an arbitration proceeding.

**f. Privilege Waiver and Other Unconscionable Provisions for Litigation Funding.**

147. Uber also seeks to impede claims by imposing unconscionable provisions concerning litigation funding. These provisions are hidden far from the other dispute resolution provisions, under the heading "5. Accessing the Services."

148. After discussing several items that actually relate to accessing the services, Uber includes a provision titled "Preventing Conflicts of Interest."

149. The provision requires claimants to "disclose any relationship that you may form with third-party Litigation Funders (whether they have an interest in the law firm representing you, your claim directly, or a portfolio of claims that involves your claim), and to disclose to Uber the relevant Litigation Funding Agreements to which you are a party or which involve your Claim(s).

150. Uber's Terms also force users to preemptively waive privilege and relevance objections by agreeing "that the existence (or not) of any Litigation Funding Agreement is relevant, admissible, within the scope of discovery, and not privileged, and that you have a continuing duty to provide Uber a copy of any Litigation Funding Agreement."

151. Even worse, "[a]s a condition of agreeing to these Terms, you waive any attorney

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

client privilege, work product privilege, common interest privilege or similar protection, and to waive any claim of confidentiality, with respect to documents that you or your counsel share with a Litigation Funder and which you or your counsel receive from a Litigation Funder and/or the Litigation Funder's counsel."

152. There is no conceivable legitimate reason for these provisions, which are obviously designed to deter potential claimants from seeking litigation funding and deter litigation funders from providing it. Uber wrote the Terms and chose the arbitration providers, if it was actually concerned about conflicts rather than deterring claims it could have specified that an arbitrator will have no connections with litigation funders or chosen an arbitration provider that does not employ such arbitrators.

**g. Other Unconscionable Provisions Regarding Fees.**

153. The Terms contain additional provisions that are unconscionable on their face or in their likely effect. For instance, the Terms mandate that for "disputes arising in California," claims will be processed by ADR Services in accordance with ADR's Arbitration Rules ("ADR Rules"). Terms § 2(c). Plaintiff Ye is a California resident and, moreover, she asserts that California law should govern the claims of all members of the putative class. Accordingly, the ADR Rules would govern her claims in arbitration and, likely, those of all putative class members. *See id.*

154. The ADR Rules include a "Mass Consumer Non-Employment Arbitration" fee provision that imposes an initial filing fee of $250 on the first claimant and follow-on fees of $295 "assess[ed] to Claimant and Respondent per claim[.]"[23] This imposition of fees on *consumers* stands in stark contrast to the ADR Rules concerning mass arbitrations initiated by employees. There, the Respondent is solely responsible for paying follow-on fees.[24]

155. Moreover, the Terms operate to allow Uber to refuse to pay filing fees without suffering any consequence. As noted above, Uber can also indefinitely stay its obligation to pay fees during the pendency of several ancillary processes (*e.g.*, the Dispute Process) that it can

[23] https://www.adrservices.com/rate-fee-schedule/

[24] *See id.* ("A $250 nonrefundable Initial Filing Fee is payable by the Claimant upon the filing of a qualifying mass [employment] arbitration claim. A $550 nonrefundable Administrative Fee will be assessed to the Respondent per claim, payable upon issuance of a commencement letter.")

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

unilaterally trigger. These stays apply to the claim at issue and, in most cases, to other pending claims.

## CALIFORNIA LAW APPLIES TO THE ENTIRE NATIONWIDE CLASS

156. California's substantive laws apply to every class member, regardless of where in the United States the class member resides.

157. California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV § 1 of the U.S. Constitution. California has significant contacts, and a significant aggregation of contacts, with the claims asserted by Plaintiffs and all class members, creating state interests such that the choice of California state law is not arbitrary or unfair.

158. Uber's United States headquarters and principal place of business are located in California. Uber's key executives and employees are located in California. On information and belief, Uber also owns property and conducts substantial business in California. Therefore, California has a significant interest in regulating Uber's conduct under its laws. Uber's decision to reside in California, avail itself of California's laws, and to engage in the challenged conduct, which originates from and emanates out of California, renders the application of California law to the claims here constitutionally permissible. Upon information and belief, California is the state from which Uber's alleged misconduct and false statements emanated. This conduct similarly injured and affected Plaintiffs and all other class members.

159. The application of California laws to the Classes is also appropriate under California's choice of law rules. California has significant contacts with the claims of Plaintiffs and the proposed Classes, and California has a greater interest in applying its laws here than any other interested state.

## CLASS ACTION ALLEGATIONS

160. Plaintiffs bring this lawsuit as a class action under Federal Rule of Civil Procedure 23.

161. Plaintiffs bring this action on behalf of themselves and on behalf of the following Classes, initially defined as follows:

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

**Nationwide Class:** All persons in the United States who, within the applicable statute of limitations, paid for any ride advertised as "Faster" or with a specific arrival time, as opposed to a range of times but were not picked up within the advertised time.

**California Class**: All persons in California who, within the applicable statute of limitations, paid for any ride advertised as "Faster" or with a specific arrival time, as opposed to a range of times, but were not picked up within the advertised time.

**Pennsylvania Class**: All persons in Pennsylvania who, within the applicable statute of limitations, paid for any ride advertised as "Faster" or with a specific arrival time, as opposed to a range of times, but were not picked up within the advertised time.

**New York Class**: All persons in New York who, within the applicable statute of limitations, paid for any ride advertised as "Faster" or with a specific arrival time, as opposed to a range of times, but were not picked up within the advertised time.

**Terms Class:** All persons in the United States who, within the applicable statute of limitations, have an Uber account and are subject to the US Terms of Use.

162. Excluded from the Classes are: (1) Uber, any entity or division in which Uber has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.

163. Plaintiffs reserve the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

164. The claims of all class members derive directly from a single course of conduct by Uber. Uber has engaged and continues to engage in uniform and standardized conduct toward the class members.

165. Certification of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

166. Accordingly, Plaintiffs bring this lawsuit as a class action on Plaintiffs' own behalf and on behalf of all other individuals similarly situated pursuant under Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these provisions. Specifically, this action has been properly brought and may

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

167. **Numerosity** (Fed. R. Civ. P. 23(a)(1)): The members of the proposed Classes are so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed the class includes tens of thousands, if not hundreds of thousands of members.

168. **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)): Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members. The common legal and factual questions include, without limitation:

a) Whether Uber engaged in the conduct alleged in this Complaint;

b) Whether Uber violated the applicable statutes alleged herein;

c) Whether Uber's conduct emanated from the State of California;

d) Whether Plaintiffs and the class members are injured and harmed directly by Uber's conduct;

e) Whether Plaintiffs and the class members are entitled to damages due to Uber's conduct as alleged in this Complaint, and if so, in what amounts; and

f) Whether Plaintiffs and the class members are entitled to declaratory relief.

169. **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)): The claims of Plaintiffs and the respective Classes are based on the same legal theories and arise from the same unlawful and willful conduct of Uber, resulting in the same injury to the Plaintiffs and Classes. Plaintiffs and all class members are similarly affected by Uber's wrongful conduct and were damaged in the same way. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other class members. Plaintiffs have been damaged by the same wrongdoing set forth in this Complaint.

170. **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)): Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the class members, and they have retained counsel who are competent and experienced in complex class actions, mass arbitrations, and consumer litigations. Plaintiffs and their counsel will fairly and

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

adequately protect the interest of the class members.

171. **<u>Superiority of a Class Action</u>** (Fed. R. Civ. P. 23(b)(3)): A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and class members. There is no special interest in class members individually controlling the prosecution of separate actions. The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Uber's conduct. Further, it would be virtually impossible for the class members individually to redress effectively the wrongs done to them. And, even if class members themselves could afford such individual litigation; the court system could not, given the thousands of cases that would need to be filed. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

172. **<u>Appropriateness of Final Injunctive or Declaratory Relief</u>** (Fed. R. Civ. P. 23(b)(2)): In the alternative, this action may properly be maintained as a class action, because:

a) the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Uber; or

b) the prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c) Uber has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

**COUNT I**
**Violations of California's Unfair Competition Law ("UCL")**
**Cal. Business & Professional Code §§17200 *et seq.***
**(By Plaintiffs, individually, and on behalf of All Classes)**

173. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

174. California Business & Professions Code, §§ 17200, *et seq.* prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Uber's false and misleading advertising claims regarding its precise arrival times and use of the "Faster" sticker violate all three prongs—unlawful, unfair, and fraudulent—of the UCL.

175. First, Uber's representations and omissions regarding precise arrival times are unlawful because they are misleading to a reasonable consumer and violate California's Consumer Legal Remedies Act and California's False Advertising Law, as alleged herein.

176. Second, Uber's representations and omissions regarding precise arrival times violate the "unfair" prong of the UCL because they are illegal, immoral, unscrupulous, and substantially injurious to consumers, and the negative impact of these representations and omissions on consumers outweighs any reasons, justifications, or motives for Uber's conduct.

177. Third, these representations and omissions violate the "fraudulent" prong of the UCL because they are likely to deceive members of the public.

178. Plaintiffs and the class members reasonably relied on Defendant's representations and omissions. The representations and omissions were material, because a reasonable consumer would consider the certainty of an expected pickup time and the speed of pickup to be important factors in deciding whether to purchase a ride, and those facts were a substantial factor in Plaintiffs' and class members' decisions to pay more and purchase a ride advertised with a precise arrival time, as "Faster," or both.

179. As a direct and proximate result of Defendant's violations of the UCL, Plaintiffs and the class members have suffered injury in fact and have lost money. Plaintiffs and the class members all paid an unwarranted premium for their ride and/or were denied the benefit of their bargain.

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

180. Absent Uber's misrepresentations and omissions, Plaintiffs and the class members would not have purchased the ride they selected or would have paid substantially less for it.

181. Plaintiffs seek relief for violations of the UCL in the form of restitution, and/or disgorgement of ill-gotten gains to compensate and make whole themselves and the class members. Restitution is appropriate because it is more certain, prompt, and efficient as compared to damages. Further, to obtain a full refund through damages, Plaintiffs would have to show that rides have no market value, whereas that showing is not required for restitution.

182. As a result of these violations under each of the fraudulent, unfair, and unlawful prongs of the UCL, Uber has been unjustly enriched at the expense of Plaintiffs and the class members. Specifically, Uber has been unjustly enriched by obtaining revenues and profits it would not otherwise have obtained absent its false, misleading, and deceptive conduct.

183. Through its unfair acts and practices, Uber has improperly obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this Court cause Uber to restore this money to Plaintiffs and all class members, and to enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Plaintiffs, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

184. **Permanent public injunctive relief**. Plaintiffs, acting as a private attorney generals, also seek public injunctive relief to protect the general public from Uber's conduct.

185. Uber's false advertising and manipulative tactics are ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiffs seek a permanent injunction to enjoin Uber from engaging in the misconduct alleged herein. Injunctive relief is appropriate because Uber continues to deceptively market its UberX and other rideshare options as providing precise pick-up times. Injunctive relief is necessary to prevent Uber from continuing to engage in unlawful conduct and to prevent future harm to Plaintiffs and the class members, which cannot be achieved through available legal remedies.

186. Plaintiffs remain in the market for rideshare services, and would purchase Uber's rideshare services, including those marketed with faster and more predictable arrival times, if they

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

could trust Uber's representations. Plaintiffs cannot do so because Uber continues to deceptively market the arrival times of its rideshare services.

**COUNT II**
**Violations of California's False Advertising Law ("FAL")**
**Cal. Business & Professional Code §§ 17500 et seq.**
**(By Plaintiffs, individually, and on behalf of All Classes)**

187. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

188. The False Advertising Law, codified at Cal. Bus. & Prof. Code §§ 17500, *et seq.*, prohibits "unfair, deceptive, untrue or misleading advertising[.]" The FAL prohibits not only advertising which is false but also advertising which, although true, is either actually misleading or has a capacity, likelihood, or tendency to deceive or confuse the public.

189. Defendant violated the FAL when it advertised and marketed rides with precise arrival times and/or as "Faster" through the unfair, deceptive, and misleading representations and omissions disseminated to the public, all of which communicated that paying more for a rideshare would mean a pick-up by a certain time. Many riders who pay for a rider advertised with a precise pickup time or as "Faster" are not picked up by the advertised time, leaving them waiting longer than expected even after paying a premium. In short, Uber often cannot deliver the advertised benefits of the service, which include a purportedly certain pickup time and a faster pickup time than several of Uber's options, including Wait & Save or Share.

190. Plaintiffs and the class members reasonably relied on Uber's representations and omissions. These representations and omissions were material because a reasonable consumer would consider the time of pickup an important factor in deciding whether to purchase a ride. The representations and omissions were also a substantial factor in Plaintiffs' and class members' decisions to pay for a ride advertised with a precise pickup time or as a "Faster" option.

191. As a direct and proximate result of Uber's violations of the FAL, Plaintiffs and the class members have all suffered injury in fact and have lost money. Plaintiffs and the class members paid an unwarranted premium for rides and/or were denied the benefit of their bargain.

192. Absent Uber's misrepresentations and omissions, Plaintiffs and the class members

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

would not have purchased their rides or would have paid substantially less for it.

193. Plaintiffs seek relief for violations of the FAL in the form of restitution, and/or disgorgement of ill-gotten gains to compensate and make whole herself and the class members. Restitution is appropriate because it is more certain, prompt, and efficient as compared to damages. Further, to obtain a full refund through damages, Plaintiffs would have to show that rides have no market value, whereas that showing is not required for restitution.

194. **Permanent public injunctive relief**. Plaintiffs, acting as a private attorney generals, also seek public injunctive relief to protect the general public from Uber's conduct.

195. Uber's false advertising and manipulative tactics are ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiffs seek a permanent injunction to enjoin Uber from engaging in the misconduct alleged herein. Injunctive relief is appropriate because Uber continues to deceptively market rides with certain pick-up time or as a "Faster" option. Injunctive relief is necessary to prevent Uber from continuing to engage in unlawful conduct and to prevent future harm to Plaintiff and the class members which cannot be achieved through available legal remedies.

196. Plaintiffs remain in the market for rideshare services, and would purchase Uber's rideshare services, including those marketed with faster and more predictable arrival times, if they could trust Uber's representations. Plaintiffs cannot do so because Uber continues to deceptively market the arrival times of its rideshare services.

**COUNT III**
**Violations of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code. §§1750 et seq.**
**(By Plaintiffs, individually and on behalf of the Nationwide Class)**

197. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth here.

198. Plaintiffs and the other class members are consumers within the meaning of Cal. Civ. Code § 1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§ 1761(e) and 1770.

199. Uber is a "person" within the meaning of Cal. Civ. Code §§ 1761(c) and 1770 and

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

sells "goods or services" within the meaning of Cal. Civ. Code §§ 1761(b) and 1770.

200. Uber and its Products are a "good" or "service" within the meaning of Cal. Civ. Code. §§ 1761(a) and (b).

201. Uber has violated § 1770(a)(5) by representing that the Product had characteristics it did not have. Uber advertises many of its rides as arriving at a specific pickup time or as "Faster" than other options, but, as Uber knows, these precise times are frequently inaccurate and no faster than less expensive fares. Therefore, despite being advertised as such, UberX times cannot be reliably predicted.

202. Uber has violated § 1770(a)(7) by misrepresenting that the Product is of a particular standard, quality, or grade. Uber markets many of its rides, such as UberX, as providing a fast pickup within a certain amount of time. However, in many instances, those rides do not arrive in the advertised window, sometimes arriving as slowly as Standard or Wait & Save rides or, in some cases, even slower. Thus, those rides are not of the premium standard, quality, or grade of which it is advertised; it is advertised with a certain, dependable faster pickup time when pickup times are also slower than advertised, and sometimes the same quality—or worse—than supposedly subpar pickup options, namely Standard or Wait & Save.

203. Uber has violated § 1770(a)(9) by advertising the Products with an intent not to sell them as advertised. Uber advertises many of its rides, such as UberX, as arriving at a specific pickup time, but, as Uber acknowledges, that these precise pickup times are no more than mere estimates. Therefore, despite being advertised as such, precise arrival times are not reliable. Uber also advertises certain rides, such as UberX, as arriving faster than its other options but, as Uber is aware, these rides can arrive as slowly, or slower, than its other options. Therefore, despite being advertised as such, these "Faster" rides are not always faster.

204. Plaintiffs and the other class members suffered actual damages as a direct and proximate result of Uber's violation of the CLRA for conduct alleged herein.

205. Plaintiffs and the class members demand judgment against Uber for actual damages, punitive damages, injunctive relief, and attorney's fees and costs.

206. **Permanent public injunctive relief**. Plaintiffs, acting as private attorney generals,

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

seek public injunctive relief to protect the general public from Uber's conduct.

207. Uber's false advertising and manipulative tactics are ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiffs seek a permanent injunction to enjoin Uber from engaging in the misconduct alleged herein. Injunctive relief is appropriate because Uber continues to deceptively market many of its rides with certain pick-up times. Injunctive relief is necessary to prevent Uber from continuing to engage in unlawful conduct and to prevent future harm to Plaintiffs and the class members, which cannot be achieved through available legal remedies.

208. Plaintiffs remain in the market for rideshare services, and would purchase Uber's rideshare services, including those marketed with faster and more predictable arrival times, if they could trust Uber's representations. Plaintiffs cannot do so because Uber continues to deceptively market the arrival times of its rideshare services.

**COUNT IV**
**Violations of Pennsylvania's**
**Unfair Trade Practices and Consumer Protection Law ("UTPCPL")**
**73 P.S. §§ 201-1, *et seq.***
**(By Plaintiff Fleming, individually and on behalf of the Pennsylvania Class)**

209. Plaintiff Fleming incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

210. Plaintiff Fleming and the other class members are "persons" within the meaning of 73 P.S. § 201-2 (2).

211. Uber is a "person" within the meaning of 73 P.S. § 201-2(2) and engages in "commerce" within the meaning of 73 P.S. § 201-2(3).

212. Uber has violated § 201-2(4)(v) by representing that the services provided by UberX and other more expensive fare options had characteristics and benefits they do not have. Uber advertises UberX and other more expensive fare options as arriving at a specific pickup time, but, as Uber acknowledges, the algorithm that predicts pickup time is flawed. Therefore, despite being advertised as such, arrival times for UberX and other more expensive fare options cannot be reliably predicted. Uber also advertises UberX and other more expensive fare options as arriving faster than its lower priced options but, as Uber is aware, UberX and other more expensive fare options can

JANOVE PLLC 979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

arrive as slowly, or slower, than its other lower priced options. Therefore, despite being advertised as such, UberX and other more expensive fare options are not always faster.

213. Uber has violated § 201-2(4)(vii) by misrepresenting that the services provided by UberX and other more expensive fare options are of a particular standard, quality, or grade. UberX and other more expensive fare options are marketed as providing both a certain and faster pickup. However, in many instances, UberX and other more expensive fare options do not arrive by the advertised pickup time. In some cases, they arrive as slowly as the times advertised for lower priced rides or even slower. Thus, UberX and other more expensive fare options are not of the premium standard, quality, or grade of which they are advertised; they are uncertain, slower than advertised, and sometimes the same quality—or worse—than supposedly subpar pickup options.

214. Uber has violated § 201-2(4)(ix) by advertising UberX and other more expensive fare option services with an intent not to sell it as advertised. Uber advertises UberX and other more expensive fare options as providing a certain pickup time, but, as Uber acknowledges, the algorithm that predicts pickup time is flawed.

215. Plaintiff Fleming and the other class members suffered actual damages as a direct and proximate result of Uber's violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law for conduct alleged herein.

216. Uber's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff Fleming and the class members and will continue to damage Plaintiff Fleming and the class members and deceive the public unless enjoined by this Court.

217. Plaintiff Fleming and the class members demand judgment against Uber for actual damages (or, at minimum, $100 in statutory damages), treble damages and attorney's fees and costs, pursuant to § 201-9.2(a), and for injunctive relief, pursuant to § 201-9.2(b).

**COUNT V**
**Violations of New York Gen. Bus. Law § 349**
**(On Behalf of Plaintiff Clay and the New York Class)**

218. Plaintiff Clay incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

219. NY GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

business, trade or commerce or in the furnishing of any service in this state."

220. Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to one thousand dollars per violation, if the court finds that the Defendant willfully or knowingly violated this section. The court may award reasonable attorneys' fees to prevailing Plaintiffs.

221. As alleged herein, Defendant's advertisements and promotion of its fares are materially misleading and deceptive within the meaning of NY GBL § 349.

222. Defendant's acts and practices deceived Plaintiff Clay and the class members. Plaintiff Clay and the class members reasonably relied on these representations and believed they were purchasing a ride that had a faster and more predictable arrival time than lower priced fares. In truth, they paid a premium price for a faster and more predictable arrival time, but did not receive one.

223. Plaintiff Clay and the class members did not receive the benefit of their bargain. They paid a price premium for fares falsely marketed as having a quicker and more predictable arrival time than lower priced fares. But Uber did not deliver on these promises.

224. Defendant disseminated these false and misleading statements throughout New York, which were known, or should have been known through reasonable care, to be untrue and misleading to consumers, including Plaintiff Clay and the class members.

225. Plaintiff Clay and the class members have been injured by Defendant's deceptive acts or practices, suffering an ascertainable loss by paying more for a product than they otherwise would have but for the false advertising.

226. Plaintiff Clay and the class members have no adequate remedy at law.

227. Defendant's conduct has caused and continues to cause immediate and irreparable injury to Plaintiff Clay and the class members and will continue to mislead consumers unless enjoined by this Court.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

**COUNT VI**
**Violations of New York Gen. Bus. Law § 350**
**(On Behalf of Plaintiff Clay and the New York Class)**

228. Plaintiff Clay incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

229. By reason of the acts set forth above, Defendant has been and is engaged in consumer-oriented advertising and marketing to Plaintiff Clay and class members located in New York, engaging in business conduct that is false and misleading in material respects, in violation of NY GBL § 350, which provides, in part, that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

230. Defendant caused statements that were untrue or misleading, and which it knew to be untrue or misleading, to be disseminated throughout New York State and elsewhere, through advertising, marketing, and other publications.

231. Defendant's misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were and continue to be exposed to Defendant's material misrepresentations.

232. Plaintiff Clay and the class members have been injured by Defendant's deceptive acts or practices.

233. Plaintiff Clay and the class members have no adequate remedy at law.

234. Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiff Clay and the class members and will continue to damage both Plaintiff Clay and the class members and deceive the public unless enjoined by this Court.

235. Pursuant to NY GBL § 350-e, Plaintiff Clay and the class members seek monetary damages (including actual damages or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to NY GBL § 350 a(1)), injunctive relief, restitution, and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

236. Defendant's conduct has also substantially injured the public, as consumers across New York were exposed to and relied upon Defendant's false advertising in deciding to purchase

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

rides from Uber. Plaintiff Clay and the class members reasonably relied on these representations and believed they were purchasing a ride with a faster and more predictable arrival time. However, their rides did not arrive faster or at the times advertised by Uber.

237. Plaintiff Clay and the class members did not receive the benefit of their bargain. They paid a price premium for fares falsely marketed as having a quicker and more predictable arrival time than lower priced fares. But Uber did not deliver on these promises.

238. The widespread deception not only caused financial harm to consumers but also promoted misleading information about arrival times and predictability of Uber rides, peddling the false narrative that consumers could pay more to obtain a faster and more predictable arrival time.

239. This misconduct also causes users to suffer additional injury in the form of frustration and delays. Users choose transit based on their schedule requirements and then after significant delays and postponed arrival times are forced to cancel rides and find alternate forms of transportation, if they can.

240. Defendant's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

**COUNT VII**
**Unjust Enrichment**
**(By Plaintiffs, individually, and on behalf of All Classes )**

241. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

242. Uber misrepresented that by paying for a ride with a precise pickup time and/or advertised as "Faster," Plaintiffs and the class members would receive pickup by a certain time. When Uber picked up users later than advertised, Uber retained the price premium.

243. Plaintiffs and the class members spent significant amounts of money on premium fees, including UberX, that they were deceived and manipulated into purchasing by Uber's dark patterns and misleading advertising.

244. Plaintiffs and the class members lack an adequate remedy at law.

245. It would be unfair for Uber to keep the money spent without compensating Plaintiffs and the class members.

JANOVE PLLC
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
115 Broadway, 5th Fl.
New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103

**COUNT VIII**
**Fraud**
**(By Plaintiffs, individually, and on behalf of All Classes)**

246. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

247. Uber, through its app, represents to consumers that it can predict, reliably and accurately, when rides will arrive. Uber does so by presenting certain rides with precise arrival times (*e.g.*, "3 min") and other arrival times with a range (*e.g.*, "4-13 min"). Uber also advertises certain ride options as "Faster" than others.

248. In fact, Uber cannot predict any arrival times with accuracy and even its precise arrival times are merely estimates and frequently inaccurate. For that reason, Uber cannot predict whether a given ride is or will be "Faster" than another, despite choosing to advertise some rides in this way.

249. Uber makes the foregoing representations and omissions intending to deceive Plaintiffs and class members into purchasing rides advertised as "Faster" and/or with precise arrival times.

250. When Uber advertises certain rides with precise arrival times and/or as "Faster," it knows those representations are false and misleading. Uber knows and knew that the arrival times it presents to consumers are frequently inaccurate.

251. Misrepresentations and omissions regarding arrival times and arrival speed are material because a reasonable consumer would consider the time and speed of pickup important factors when deciding whether to pay more for an Uber ride, and were, in fact, a substantial factor in Plaintiffs' decisions—and the decisions of class members—to purchase an UberX ride.

252. Uber's fraudulent misrepresentations and omissions directly and proximately caused injury in fact and actual damage to Plaintiffs and class members. Absent these misrepresentations, Plaintiffs and class members would not have paid for rides advertised with precise arrival times or would have paid substantially less for them.

253. Plaintiffs seek actual, compensatory, and punitive damages in an amount to be proved at trial on behalf of themselves and class members.

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

**COUNT IX**
**For Declaratory Judgment or Relief**
**Cal. Civ. Code § 1060, *et seq.***
**(By Plaintiffs, individually, and on behalf of the Terms Class)**

254. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

255. Under California law, "[a]ny person interested under a written instrument…or under a contract, or who desires a declaration of his or her rights or duties with respect to another…may, in cases of an actual controversy relating to the legal rights and duties of the respective parties," may maintain a complaint or cross complaint "for a declaration of his or her rights and duties." Furthermore, he or she "may ask for a declaration of rights or duties, either alone, or with other relief, and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time." Cal. Civ. Code § 1060.

256. As described above, Uber's Terms contain a purported arbitration clause that is not in fact an agreement to settle claims through arbitration, and that is substantively and procedurally unconscionable under California law. This renders the arbitration clause contained within the Terms unenforceable against Plaintiffs and all members of the putative User Class.

257. An actual controversy of sufficient immediacy exists between the Plaintiffs and the putative Terms Class, on the one hand, and Uber concerning their respective rights and duties under the Terms. Plaintiffs contend that the purported arbitration clause contained within the Terms is void and unenforceable. Uber contends and acts as if the arbitration clause has legal force.

258. Plaintiffs seek a judicial determination of rights and duties and a declaration or judgement that the purported arbitration clause contained in the Terms is void and unenforceable against them or against any members of the putative User Class.

259. A judicial declaration would advise Plaintiffs and other members of the putative Terms Class of their rights and would advise Uber of its duties to Plaintiffs and other Uber users regarding the resolution of disputes, specifically whether disputes could proceed in court or, alternatively, would have to go through the arbitration process described in Uber's Terms.

260. Such a declaration would not only benefit Plaintiffs and the class members, but

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

would also inure for the benefit of the public at large. The Ninth Circuit has specifically held that an unconscionable arbitration clause is "contrary to" California's "fundamental policy" against enforcing such agreements. *E.g.*, *Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1083 (9th Cir. 2008) (per curiam); *Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1067 (9th Cir. 2007) (per curiam). Moreover, Uber's Terms violate California's public policy against allowing corporate actors to unilaterally impose exculpatory clauses into contracts of adhesion, *Discover Bank v. Superior Court*, 36 Cal.4th 148, 161 (2005) and, more broadly, violates "California's 'strong public policy' to 'protect consumers against unfair and deceptive business practices,'" *see Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009), by insulating Uber from consumer claims based on unfair practices, like those alleged here. *See also McGill v. Citibank, N.A.*, 393 Cal.5th 945, 952 (2017) (articulating California's public policy against impediments to consumers' right to seek public injunctive relief under state law).

**COUNT X**
**For Declaratory Judgement or Relief**
**Federal Declaratory Judgment Act 28 U.S.C. §§ 2201-2202**
**(By Plaintiffs, individually and on behalf of the Terms Class)**

261. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

262. Under federal law, "[i]n a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment and shall be reviewable as such." 28 U.S.C. § 2201; *see also* Fed. R. Civ. P. 57.

263. An actual controversy of sufficient immediacy exists between the Plaintiffs and the putative User Class, on the one hand, and Uber concerning their respective rights and duties under the Terms. Plaintiffs contend that the purported arbitration clause contained within the Terms is void and unenforceable. Uber contends and acts as if the arbitration clause has legal force.

264. Plaintiffs seek a judicial determination of rights and duties and a declaration or judgement that the purported arbitration clause contained in the Terms is void and unenforceable

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

against them or against any member of the putative User Class.

265. A judicial declaration would advise Plaintiffs and other members of the putative Terms Class of their rights and would advise Uber of its duties to Plaintiffs and other Uber users regarding the resolution of disputes, specifically whether disputes could proceed in court or, alternatively, would have to go through the arbitration process described in Uber's Terms.

266. Such a declaration would not only benefit Plaintiffs and the class members, but also would inure for the benefit of the public at large. Such a declaration would not solely benefit Plaintiffs and members of the putative Terms Class but would inure for the benefit of the public at large. The Ninth Circuit has specifically held than an unconscionable arbitration clause is "contrary to" California's "fundamental policy" against enforcing such agreements. *E.g.*, *Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1083 (9th Cir. 2008) (per curiam); *Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1067 (9th Cir. 2007) (per curiam). Moreover, Uber's Terms violate California's public policy against allowing corporate actors to unilaterally impose exculpatory clauses into contracts of adhesion, *Discover Bank v. Superior Court*, 36 Cal.4th 148, 161 (2005) and, more broadly, violates "California's 'strong public policy' to 'protect consumers against unfair and deceptive business practices,'" *see Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009), by insulating Uber from consumer claims based on unfair practices, like those alleged here. *See also McGill v. Citibank, N.A.*, 393 Cal.5th 945, 952 (2017) (articulating California's public policy against impediments to consumers' right to seek public injunctive relief under state law).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and the class members as follows:

A. certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Classes, and designating Plaintiffs' counsel as Class Counsel;

JANOVE PLLC
979 Osos St., Ste. A5 San Luis Obispo, CA 93401
115 Broadway, 5th Fl. New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103

B. awarding Plaintiffs and the Consumer Classes[25] compensatory damages and actual damages to be determined by proof;

C. awarding Plaintiffs and the Consumer Classes restitution;

D. awarding Plaintiffs and the Consumer Classes punitive damages;

E. for injunctive relief on behalf of Plaintiffs and the Classes, as well as on behalf of the public;

F. for declaratory and equitable relief, including a declaration that Uber violated and has continued to violate, California's UCL, FAL, and CLRA, as well as the common law of unjust enrichment and fraud, and an injunction requiring Uber to comport with these state statutes, and for restitution and disgorgement;

G. for further declaratory and equitable relief, including a declaration that the purported arbitration clause contained in Uber's Terms is void and unenforceable against Plaintiffs and all members of the putative Terms Class, and an injunction forbidding Uber from enforcing its dispute resolution provisions against any member of the putative Terms Class;

H. awarding Plaintiffs and the Class the costs of prosecuting this action;

I. awarding Plaintiffs and the Class reasonable attorneys' fees and costs, as allowable by law;

J. awarding pre-judgment and post-judgment interest; and

K. granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury for all claims so triable.

Respectfully submitted,

[25] The Nationwide Class, the California Class, the Pennsylvania Class and the New York Class are referred to collectively as the "Consumer Classes."

DATED: May 22, 2026

By: /s/ *Raphael Janove*
Raphael Janove

**JANOVE PLLC**
Raphael Janove (SBN 361193)
raphael@janove.law
115 Broadway, 5th Fl.
New York, NY 10006
Telephone: (646) 347-3940

**JANOVE PLLC**
Liana Roza Vitale (SBN 348772)
liana@janove.law
979 Osos St., Ste. A5
San Luis Obispo, CA 93401
Telephone: (805) 505-9550

*Attorneys for Plaintiffs and the Proposed Classes*

979 Osos St., Ste. A5 San Luis Obispo, CA 93401 115 Broadway, 5th Fl. New York, NY 10006 1617 John F. Kennedy Blvd., 20th Fl. Philadelphia, PA 19103