# EXHIBIT B

FILED
Superior Court of California
County of San Francisco

MAY 21 2026

CLERK OF THE COURT
BY: [signature]
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

ANDRE ALMOND and HANS RUUD, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

UBER TECHNOLOGIES, INC.,

Defendant.

Case No. CGC-25-630922

ORDER GRANTING MOTION TO COMPEL ARBITRATION

**INTRODUCTION**

This is a reverse gender discrimination lawsuit brought by Andrew Almond and Hans Ruud, on behalf of themselves and a putative class, against Uber Technologies, Inc. They assert a single cause of action against Uber for violation of California's Unruh Civil Rights Act (Civ. Code, § 51). Uber moves to compel them to arbitrate their claim on an individual basis. The motion came on for hearing on May 18, 2026, at 9:00 a.m. in Department 613, the Honorable Jeffrey S. Ross presiding. David Rosenthal and Bryan Weir (Consovoy McCarthy PLLC) appeared for plaintiffs. Felicia Ellsworth and Jason Allen (Wilmer Cutler Pickering Hale & Dorr LLP) appeared for Uber. IT IS HEREBY ORDERED that the motion to compel arbitration is **GRANTED**. This proceeding is **STAYED** during the pendency of the arbitration. The court **RESERVES** a further case management conference for **September 3, 2026, at 9:00 a.m.** with a joint statement due no later than **August 27, 2026,** confirming initiation of arbitration, the assigned arbitrator, and the date of the initial scheduling conference. If plaintiffs have not timely

initiated arbitration—in lieu of a joint statement—by **August 27, 2026**, they must show cause why this action should not be dismissed.

## BACKGROUND

### A. PLAINTIFFS' ALLEGATIONS OF REVERSE GENDER DISCRIMINATION

Almond has driven for Uber in the Los Angeles area since 2018, and Ruud has driven for Uber in San Francisco since 2015. Plaintiffs allege that in July 2025, Uber announced the expansion of a program known as the Women Preferences program to allow women riders and drivers to be matched with other women for trips arranged through Uber. (Compl., ¶ 13.) Originally piloted in other countries, Uber expanded the program to the United States, including the cities of Los Angeles and San Francisco in 2025. (Compl., ¶¶ 13–16.) Plaintiffs describe the program as being implemented through the Uber app, in which riders and drivers can use a toggle button to indicate a preference for being matched with other female drivers or riders, respectively. (Compl., ¶ 16.) Other than quoting a statement by Uber to the effect that the settings will increase one's chance of being matched with a woman driver, plaintiffs do not otherwise describe how exactly the program works in the United States. (Compl., ¶ 17.) Plaintiffs allege that "Uber unlawfully discriminated against Plaintiffs and Class Members based on sex by implementing a sex-based 'preference feature' that promotes female drivers over male driver [*sic*] in offering business opportunities (rides) based on sex." (Compl., ¶ 55.) Plaintiffs also allege the program is a "discriminatory policy [that] perpetuates negative stereotypes about the male drivers who they are seeking to limit interactions of with female riders." (Compl., ¶ 56.)

Plaintiffs assert a single cause of action for violation of the Unruh Civil Rights Act (Civ. Code, § 51) on behalf of themselves and a putative class of: "All male individuals within the applicable statute of limitations who drove with Uber in California against whom Uber discriminated by implementing a sex-based preference feature, marketed as the Women Preferences program, that disfavored them on the basis of sex." (Compl., ¶ 37.) Plaintiffs request damages ("statutory, actual, compensatory, consequential, punitive, and nominal"), restitution, disgorgement, declaratory relief, and injunctive relief. (Compl. at p. 15.) Uber maintains that plaintiffs must arbitrate their claim.

//

//

### B. UBER'S 2022 PLATFORM ACCESS AGREEMENT

Uber asserts that both Almond and Ruud accepted the operative version of its Platform Access Agreement, updated in 2022 (hereafter 2022 Agreement), which contains an arbitration provision.[1] (O'Connor Decl., ¶¶ 10–16, 27–30 & Exs. A–D, I.) Almond accepted the 2022 Agreement on July 9, 2023, at 5:58 PM (UTC) (O'Connor Decl., Ex. D), and Ruud accepted the same agreement on May 9, 2024 (O'Connor Decl., Ex. I). The pertinent terms of the 2022 Agreement (O'Connor Decl., Ex. C) are as follows (emphasis in original):

> **12.2. Severability.** Invalidity of any provision of this Agreement does not affect the rest of this Agreement. The parties shall replace the invalid or non-binding provision with provision(s) that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.
>
> * * *
>
> **12.7. Governing Law.** Except as specifically provided in this PAA, this PAA is governed by the applicable law of the state where you reside (or where your entity is domiciled) when you accepted this PAA (the "Governing Law"). The Governing Law shall apply without reference to the choice-of-law principles that would result in the application of the laws of a different jurisdiction.
>
> * * *
>
> **13. Arbitration Provision**
>
> **IMPORTANT: PLEASE REVIEW THIS ARBITRATION PROVISION CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH US ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION, EXCEPT AS PROVIDED BELOW. YOU MAY OPT OUT OF THIS ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS BELOW. THERE ARE AND/OR MAY BE LAWSUITS ALLEGING CLASS, COLLECTIVE, COORDINATED, CONSOLIDATED, AND/OR REPRESENTATIVE CLAIMS ON YOUR BEHALF AGAINST US. IF YOU DO NOT OPT OUT OF THIS ARBITRATION PROVISION AND THEREFORE AGREE TO ARBITRATION WITH US, YOU ARE AGREEING IN ADVANCE, EXCEPT AS OTHERWISE PROVIDED BELOW, THAT YOU WILL NOT PARTICIPATE IN AND, THEREFORE, WILL NOT SEEK OR**

[1] Uber also presents evidence that Ruud entered into various earlier agreements containing arbitration clauses, including a 2014 Software License and Online Services Agreement, 2015 and 2019 editions of a Technology Services Agreement, and a January 2020 Platform Access Agreement. Uber notes that Ruud opted out of the arbitration provision in the December 2015 Technology Services Agreement *but not the later agreements, including the 2022* Agreement. Section 11 of the 2022 Agreement largely terminates prior agreements, with the exception of arbitration provisions. (See O'Connor Decl., Ex. C at p. 24, § 11.1.) However, the parties do not contend that those earlier arbitration provisions impact this motion.

**BE ELIGIBLE TO RECOVER MONETARY OR OTHER RELIEF IN CONNECTION WITH, ANY SUCH CLASS, COLLECTIVE, COORDINATED, CONSOLIDATED, AND/OR REPRESENTATIVE LAWSUIT. THIS ARBITRATION PROVISION, HOWEVER, WILL ALLOW YOU TO BRING INDIVIDUAL CLAIMS IN ARBITRATION ON YOUR OWN BEHALF.**

**13.1. How This Arbitration Provision Applies.**

(a) This Arbitration Provision is a contract governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and evidences a transaction involving commerce, and you agree that this is not a contract of employment involving any class of workers engaged in foreign or interstate commerce within the meaning of Section 1 of the Federal Arbitration Act. If notwithstanding the foregoing, the Federal Arbitration Act does not apply to this Arbitration Provision, the law pertaining to arbitration agreements of the state where you reside when you entered into this Agreement shall apply. Except as it otherwise provides, this Arbitration Provision applies to any legal dispute, past, present or future, arising out of or related to your relationship with us or relationship with any of our agents, employees, executives, officers, investors, shareholders, affiliates, successors, assigns, subsidiaries, or parent companies (each of which may enforce this Arbitration Provision as third party beneficiaries), and termination of that relationship, and survives after the relationship terminates.

(b) This Arbitration Provision applies to all claims whether brought by you or us, except as provided below. This Arbitration Provision requires all such claims to be resolved only by an arbitrator through final and binding individual arbitration and not by way of court or jury trial. Except as provided below regarding the Class Action Waiver and Representative Action Waiver, such disputes include without limitation disputes arising out of or relating to the interpretation, application, formation, scope, enforceability, waiver, applicability, revocability or validity of this Arbitration Provision or any portion of this Arbitration Provision.

(c) Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to disputes between you and us, or between you and any other entity or individual, arising out of or related to your application for and use of an account to use our Platform and Driver App as a driver, the P2P Service that you provide … discrimination, or harassment, and claims arising under the . . . Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 . . . federal, state or local statutes or regulations addressing the same or similar subject matters, and all other federal, state or local statutory, common law and legal claims (including without limitation, torts) arising out of or relating to your relationship with us or the termination of that relationship.

**13.2. Limitations On How This Arbitration Provision Applies**

* * *

(c) To the extent an Act of Congress or applicable federal law not preempted by the Federal Arbitration Act provides that a particular claim or dispute may not be subject to arbitration, such claim or dispute is excluded from the coverage of this Arbitration Provision. Likewise, if the Federal Arbitration Act does not apply to a claim or dispute, any claims or disputes

that may not be subject to arbitration under applicable state arbitration law will be excluded from the coverage of this Arbitration Provision.

* * *

**13.3. Governing Rules, Starting The Arbitration, And Selecting The Arbitrator.**

(a) For claims involving use of the Platform and Driver App in California: The ADR Services, Inc. Arbitration Rules ("ADR Rules") will apply to arbitration under this Arbitration Provision; however, if there is a conflict between the ADR Rules and this Arbitration Provision, including but not limited to whether any arbitration may proceed on an individual basis, this Arbitration Provision shall govern. The ADR Rules are available by, for example, searching Google.com to locate "ADR Services, Inc. Rules," or by clicking here: https://www.adrservices.com/services/arbitration-rules/. If, for any reason, ADR Services, Inc. will not administer the arbitration and the parties cannot mutually agree on a neutral arbitration provider, either party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration provider with operations in California. Any arbitration provider appointed by a court under 9 U.S.C. § 5 shall conduct arbitration solely on an individualized basis. Once an arbitration provider is appointed under 9 U.S.C. § 5, or the parties mutually agree upon a neutral arbitration provider, the ensuing arbitration shall commence pursuant to the rules of the designated arbitration provider; however, if there is a conflict between the rules of the designated arbitration provider and this Arbitration Provision, including but not limited to whether any arbitration may proceed on an individual basis, this Arbitration Provision shall govern.

* * *

(h) Mass arbitration dispute procedure[2]: If 20 or more arbitration demands of a substantially similar nature are initiated against you or us within a 180-day period by the same law firm or collection of law firms that represents the other party ("mass arbitration demands"), the following procedure shall apply. At the request of either party, an arbitrator shall be selected pursuant to the applicable arbitration provider's rules for selection of an arbitrator to act as a special master ("Special Master") to resolve threshold disputes regarding the propriety of some or all the mass arbitration demands. These threshold disputes may include, but are not limited to: (1) any dispute regarding filing fees owed with respect to the mass arbitration demands, including whether claimants have submitted valid fee waivers; (2) any dispute regarding whether the applicable arbitration provider has complied with the Arbitration Provision with respect to processing and administering the mass arbitration demands; (3) any dispute regarding whether the mass arbitration demands meet the requirements set forth in Section 13.3(c) or (e) above; (4) any dispute regarding whether the demands have complied with all conditions precedent to commencing arbitration, including compliance with the informal dispute resolution process described in Section 13.3(d) above; (5) any dispute regarding whether claimants have ever had a driver account; (6) any dispute regarding whether claimants are barred from proceeding with their claims based on a prior settlement agreement or

[2] The court does not reproduce the entirety of the mass arbitration procedure here and discusses other relevant provisions of the mass arbitration procedure in discussing the parties' arguments below.

expiration of the statute of limitations; (7) any dispute relating to representation of the same claimant by multiple law firms; (8) any dispute regarding whether the mass arbitration demands were filed with the correct arbitration provider; (9) any dispute regarding whether the mass arbitration demands violate Rule 11 of the Federal Rules of Civil Procedure and/or any applicable state law equivalent; and (10) any other dispute or issue regarding the equitable and efficient initial case management of the mass arbitration demands, including, but not limited to, the timing and/or sequence of payment of any remaining filing or administrative fees or costs related to the mass arbitration demands. Any request to appoint a Special Master pursuant to this procedure must be submitted in writing to the applicable arbitration provider, with a copy to the other party, within fifteen (15) days after filing and service (as described in Section 13.3(e)) of any arbitration demand that qualifies as part of the same group of mass arbitration demands within the meaning of this Section 13.3(h) (i.e., 20 or more arbitration demands of a substantially similar nature initiated within a 180 day period by the same law firm or collection of law firms. Mass arbitration demands initiated by a different law firm or collection of law firms shall be considered a separate group of mass arbitration demands and shall be administered separately). For the sake of clarity, the request to appoint a Special Master need not be submitted in response to the first arbitration demand that triggers the mass arbitration dispute procedure (i.e., the 20th demand), and the request is subject only to the limitations set forth in this Section 13.3(h).

* * *

**13.8. Your Right To Opt Out Of This Arbitration Provision**

(a) Agreeing to this Arbitration Provision is not a mandatory condition of your contractual relationship with us. If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision (subject to the pending litigation provision in Section 13.2, and the limitations set forth in this Section 13.8). To do so, within 30 days of the date that this Agreement is electronically accepted by you, you must send an electronic email from the email address associated with your driver account to optout@uber.com, stating your intent to opt out of this Arbitration Provision, as well as your name, the phone number associated with your driver account, and the city in which you reside.

(b) An email sent by your agent or representative (including your counsel) shall not be effective. Your email may opt out yourself only, and any email that purports to opt out anyone other than yourself shall be void as to any others. Should you not opt out of this Arbitration Provision within the 30-day period, you and Uber shall be bound by the terms of this Arbitration Provision. You will not be subject to retaliation if you exercise your right to opt out of this Arbitration Provision.

(c) Any opt out of this Arbitration Provision does not affect the validity of any other arbitration agreement between you and us. If you opt out of this Arbitration Provision and at the time of your receipt of this Agreement you were bound by an existing agreement to arbitrate disputes arising out of or related to your use of our Platform and Driver App, that existing arbitration agreement will remain in full force and effect.

> (d) Neither your acceptance of this Agreement nor your decision to opt out of this Arbitration Provision will affect any obligation you have to arbitrate disputes not specified in this Arbitration Provision pursuant to any other agreement you have with us or any of our subsidiaries or affiliate entities. Likewise, your acceptance of or decision to opt out of any other arbitration agreement you have with us or any of our subsidiaries or affiliate entities shall not affect any obligation you have to arbitrate claims pursuant to this Arbitration Provision.

## LEGAL STANDARD

Under Code of Civil Procedure section 1281.2, a party may seek to compel arbitration of a dispute upon alleging that there is a written agreement to arbitrate and that the other party refuses to arbitrate the controversy. In ruling on such a petition or motion, a court principally determines whether a valid and enforceable agreement to arbitrate exists that requires arbitration of the controversy at issue. (See generally *M & M Foods, Inc. v. Pacific American Fish Company, Inc.* (2011) 196 Cal.App.4th 554, 559.) When evaluating and interpreting arbitration agreements, courts primarily apply ordinary rules of contract interpretation. (*Maggio v. Windward Cap. Mgmt. Co.* (2000) 80 Cal.App.4th 1210, 1214.) A court seeks to give effect to the mutual intent of the parties starting, principally, from the language of the contract. (*Ibid.*, citing Civ. Code, §§ 1636, 1638.)

When an arbitration agreement is governed by the Federal Arbitration Act ("FAA"), a California court's analysis of the existence and enforceability of an arbitration agreement may also be dictated by federal jurisprudence—notwithstanding ordinary principles of California law—based on the doctrine of preemption. (See, e.g., *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639, 649–50.) "Section 2 of the [FAA] makes arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2." (*Ibid.*) The Supreme Court has historically interpreted Section 2 of the FAA as containing an enforcement clause and a savings clause that "jointly establish 'an equal-treatment principle: A court may invalidate an arbitration agreement based on "generally applicable contract defenses" like fraud or unconscionability, but not on legal rules that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."' [Citations.]" (*Ibid.*) "Under that principle, the FAA 'preempts any state rule discriminating on its face against arbitration—for example, a law "prohibit[ing] outright the arbitration of a particular type of claim."' [Citations.]" (*Ibid.*) As another example, although most California principles of contract interpretation apply, the principle of *contra proferentem* does not; instead, doubts regarding arbitrability

arising from ambiguities in an arbitration agreement are resolved in favor of arbitration. (*Lamps Plus, Inc. v. Varela* (2019) 587 U.S. 176, 186–88.)

**DISCUSSION**

For purposes of this motion, the evidence is undisputed: plaintiffs acknowledge they each assented to Uber's 2022 Platform Access Agreement and that its arbitration provision covers their claim. Instead, plaintiffs seek to avoid enforcement of the 2022 Agreement based on the defense of unconscionability. Plaintiffs rely on *Heckman v. Live Nation Entertainment, Inc.* (9th Cir. 2024) 120 F.4th 670 and California's now-preempted *Discover Bank* rule to argue the Agreement is unconscionable and unenforceable. (*Discover Bank v. Super. Ct.* (2005) 36 Cal.4th 148 (*Discover Bank*); *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 352 [holding *Discover Bank* rule preempted by FAA] (*Concepcion*).) In the alternative, plaintiffs argue that, even if the FAA applies, the agreement as a whole is unconscionable. In advancing this second argument, plaintiffs argue the delegation clause, in particular, is unconscionable such that the court, not the arbitrator, must evaluate their unconscionability defense.

**I. UBER ESTABLISHES THE EXISTENCE OF AN ARBITRATION AGREEMENT COVERED BY THE FAA.**

The FAA proclaims: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4." (9 U.S.C. § 2.) The words "'involving commerce' … are broader than the often-found words of art 'in commerce.'" (*Allied-Bruce Terminix Companies, Inc. v. Dobson* (1995) 513 U.S. 265, 273.) "The Supreme Court has interpreted 'involving commerce' 'as the functional equivalent of the more familiar term "affecting commerce"—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power.'" (*Williams v. Eaze Sols., Inc.* (N.D. Cal. 2019) 417 F.Supp.3d 1233, 1238, quoting *Citizens Bank v. Alafabco, Inc.* (2003) 539 U.S. 52, 56 [per curiam].) Generally, the "party asserting the FAA applies to an agreement has 'the burden to demonstrate the FAA coverage by declarations and other evidence.'

(*Hoover v. American Income Life Insurance Co.* (2012) 206 Cal.App.4th 1193, 1207.)" (*Everskaas v. California Transit, Inc.* (2022) 81 Cal.App.5th 285, 292.)

Uber demonstrates, as a threshold matter, that the FAA applies because the 2022 Agreement evidences a transaction involving commerce and because the 2022 Agreement expressly invokes the FAA. (2022 Agr., § 13.1(a); Mem. of Pts. & Auth. at pp. 13:10–14:1, citing *Victrola 89, LLC v. Jaman Properties 8 LLC* (2020) 46 Cal.App.5th 337.) Plaintiffs do not dispute these points. Instead, relying on *Heckman*, plaintiffs dispute whether the 2022 Agreement is an agreement to settle a controversy by *arbitration*. Plaintiffs contend the 2022 Agreement resembles the agreement at issue in *Heckman*, that the FAA does not apply, and that the *Discover Bank* rule invalidates the class action waiver in the 2022 Agreement. The court disagrees.

**A. The *Discover Bank* Rule Is Inapplicable and Does Not Justify Denial of the Motion.**

For context, in *Discover Bank*, the California Supreme Court—without categorically invalidating class action waivers—held that such waivers in the arbitration provision of a consumer contract of adhesion may be unconscionable and unenforceable under Civil Code section 1668 when "disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money…." (*Discover Bank*, *supra*, 36 Cal.4th at p. 163.) The California Supreme Court also concluded that such a rule was not preempted by section 2 of the FAA. (*Id.* at pp. 163–64.) In *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 352 (*Concepcion*) the United States Supreme Court disagreed and held the *Discover Bank* rule was preempted by the FAA.

To avoid this outcome, plaintiffs rely on *Heckman*, where the Ninth Circuit held that an arbitration agreement that contained a mass arbitration provision was both substantively and procedurally unconscionable. (*Heckman*, *supra*, 120 F.4th at pp. 681–88.) As an alternative ground, with respect to that particular mass arbitration provision, the Ninth Circuit held, even in light of *Concepcion*, the *Discover Bank* rule is not preempted by the FAA "as it applies to mass arbitration." (*Heckman*, *supra*, 120 F.4th at pp. 689–90.) This is because the mass arbitration provision at issue in the contract before the Ninth Circuit did not truly constitute an arbitration agreement within the meaning of and subject to the FAA due

to the way that the contract's procedures so fundamentally differed from the bilateral arbitration contemplated by Congress when it passed the FAA. (*Ibid.*) Plaintiffs rely on this reasoning to avoid the FAA and invoke *Discover Bank*. But the *Discover Bank* rule is inapplicable by its own terms.

First, the Agreement is not a consumer contract of adhesion, and it contains an opt-out provision. (2022 Agr., § 13.8.) As evidence that Ruud understood the effect of an opt-out provision, he opted-out of the arbitration provision in the 2015 Technology Services Agreement by sending emails to Uber. (O'Connor Decl., Exs. J–K.) Second, contrary to plaintiffs' opposition stating that they merely seek statutory damages of $4,000 per violation, characterized as "relatively low amounts, 'too small to warrant individual litigation'" (Opp. at p. 6:13–15), their complaint states: "Plaintiffs, on behalf of themselves and the Class, seek declaratory, injunctive, and equitable relief; restitution; actual, consequential, statutory, and punitive damages; and reasonable attorneys' fees, costs, and other litigation expenses." (Compl., ¶ 58.) Their prayer for relief states: "Plaintiffs, on behalf of themselves and the proposed Class request that the Court enter an order . . . Awarding declaratory relief against Defendant; Awarding injunctive and any other equitable relief the Court deems appropriate; Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and disgorgement of profits unlawfully obtained; Awarding Plaintiffs and Class Members pre- and post-judgment interest; Awarding Plaintiffs and Class Members reasonable attorneys' fees, costs, and expenses. . . ." (Compl. at pp. 14–15.) Violation of the Unruh Civil Rights Act, authorizes recovery of actual damages *in addition to* "up to a maximum of three times the amount of actual damages but in no case less than four thousand dollars $4,000" for every offense." (Civ. Code, § 52.) Thus, plaintiffs do not establish *Discover Bank* applies.

Finally, plaintiffs simply conclude that "Uber's class waiver is unconscionable and unenforceable" (Opp. at p. 6:25). But this conclusion, which is based on their erroneous application of *Discover Bank*, does not support denial of the motion.

**B. *Heckman* Is Distinguishable, and the FAA Applies.**

Plaintiffs' argument against application of the FAA and for application of *Discover Bank*, as well as their unconscionability arguments *post*, rest on the proposition that the Agreement and circumstances here resemble those in *Heckman*.

*Heckman* involved a browsewrap agreement that applied retroactively each time a consumer visited the Ticketmaster website regardless of whether any new ticket purchase was made. (*Heckman*, *supra*, 120 F.4th at p. 678.) The terms and conditions used by defendant and appellant Live Nation Entertainment, Inc. on its Ticketmaster website incorporated mass arbitration rules created by a new arbitration provider, New Era ADR, that the Ninth Circuit described as "internally inconsistent, poorly drafted, and riddled with typos . . . that Live Nation's counsel struggled to explain. . . at oral argument." (*Heckman*, *supra*, 120 F.4th at pp. 677–78 ["New Era's Rules for Expedited/Mass Arbitration proceedings differ significantly from the rules of traditional arbitration fora [sic] such as Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association."].) Most significantly, the rules required claims to be "batched" with bellwether cases selected by New Era and with non-bellwether plaintiffs bound by the arbitrator's decision on common issues in the batched cases. (*Id.* at p. 678.) A comparison of the *Heckman* arbitration provision and rules with the 2022 Agreement, reveals the inapplicability of that holding.

In contrast, here, Uber has presented a standard form of agreement that elects to use ADR Services, Inc. as the arbitration provider for California disputes and directs compliance with the ADR Services, Inc. rules. (O'Connor Decl., Ex. C [2022 Agr., § 13.3(a)].) It is undisputed that plaintiffs affirmatively consented to the 2022 Agreement by clicking "I agree," not simply browsing a website. (O'Connor Decl., ¶¶ 11–12, 14, 27–30 & Exs. A–B, D, I.)

Additionally, section 13.3(h) of the 2022 Agreement is not analogous to the mass arbitration rules and procedures at issue in *Heckman*; the mere fact that the 2022 Agreement provides for some organized processing of mass demands for arbitration does not support application of the conclusion reached in *Heckman*. In *Heckman*, batching procedures were triggered by just five or more cases involving common issues of law or fact as determined in the sole discretion of New Era, the ADR provider. (*Heckman*, *supra*, 120 F.4th at p. 678.) Here, procedures for coordinated claims are triggered by *20 or more* claimants raising similar claims within a 180-day period *and represented by the same firm or collection of law firms*. (O'Connor Decl., Ex. C, § 13.3(h).) These distinctions, including the 180-day timeframe, are significant as, unlike in *Heckman*, the procedures for mass arbitration here are designed—not to deprive

individuals of due process when many individuals independently proceed to file claims or demands for arbitration but to orderly address the volume of claims filed by particular law firms.

Recently the Ninth Circuit highlighted the unique nature of the arbitration provisions in *Heckman* and provided further guidance on its decision, which confirms *Heckman's* inapplicability to the facts here. In *Jones v. Starz Entertainment, LLC* (9th Cir. 2025) 129 F.4th 1176, 1182, the court explained:

> That case concerned novel arbitration procedures used by New Era ADR ("New Era"). *Heckman*, 120 F.4th at 676–80. We held the arbitration agreement substantively unconscionable based on, among other reasons, serious misgivings about New Era's use of bellwether cases in its mass arbitration protocol. *Id.* at 684–85. There, after New Era compiled similar cases into a batch, three bellwether cases were selected to serve as precedents for all cases in the same batch. *Id.* at 678. Claimants in non-bellwether cases had no right to participate in the bellwether cases, no access to the bellwether decision until it was invoked against them, no notice of the bellwether cases, no opportunity to be heard, and no right to opt out of the batch. *Id.* at 684. In short, New Era's protocol contained all the red flags associated with classwide arbitration.

In sum, the 2022 Agreement—employing ADR Services, Inc. as the arbitration provider for California disputes and applying ADR Services, Inc.'s rules—bears no resemblance to *Heckman*. The court rejects the argument, based on *Heckman*, that the 2022 Agreement is not an arbitration agreement and concludes the FAA clearly applies.

## II. Threshold Questions of Enforceability Are Validly Delegated to the Arbitrator.

Plaintiffs also challenge the entire 2022 Agreement as unconscionable and claim the 2022 Agreement does not clearly and validly delegate authority to resolve the unconscionability defense to the arbitrator. In making this argument, plaintiffs assert the delegation clause, in particular, is unconscionable.

### A. The 2022 Agreement Clearly and Unmistakably Delegates Threshold Issues to the Arbitrator.

"A delegation clause is effectively a second arbitration agreement in which the parties agree to arbitrate threshold issues concerning the interpretation or scope of a primary arbitration agreement." (*Olson v. FCA US, LLC* (9th Cir., Apr. 7, 2026, No. 24-6527) __ F.4th __ [2026 WL 934267], citing *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 68 (*Rent-A-Center*).) "Where it is clear that the parties have agreed to delegate questions of arbitrability to an arbitrator, the Federal Arbitration Act requires. . . courts to enforce that delegation." (*Olson, supra*, 2026 WL 934267 at *2, citing *Rent-A-*

*Center*, *supra*, 561 U.S. at p. 70; accord *Tiri v. Lucky Chance, Inc.* (2014) 226 Cal.App.4th 231, 240–42 [discussing similarities between FAA and California law on delegation clauses; holding plaintiff-appellee failed to establish delegation clause was unconscionable].)

Section 13.1, subparagraph (b) expressly delegates to the arbitrator the authority to resolve all disputes "including without limitation disputes arising out of or relating to the interpretation, application, formation, scope, enforceability, waiver, applicability, revocability or validity of" the arbitration provision. This language is a clear agreement to arbitrate threshold issues of arbitrability, such as whether the 2022 Agreement is unconscionable and, thus, unenforceable. For the avoidance of doubt, subparagraph (j) of section 13.3 reiterates (emphasis added): **Only an arbitrator**, and not any federal, state, or local court or agency, **shall have exclusive authority to resolve any dispute arising out of or relating to** the interpretation, applicability, **enforceability**, or formation of **this Arbitration Provision, including without limitation any claim that all or part of this Arbitration Provision is void or voidable. An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues.**" There are no exceptions to this delegation language that apply here. Section 13.3, subparagraph (j) also states: "However, only a court of competent jurisdiction, and not an arbitrator, shall have exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver and/or Representative Action Waiver—including, but not limited to, any claim that all or part of the Class Action Waiver and/or Representative Action Waiver is unenforceable, unconscionable, illegal, void, or voidable, or that a breach of either such Waiver has occurred." (See also 2022 Agr., §§ 13.4(d), 13.5(d).) But this exception does not apply here nor does it create any ambiguity or question as to the fact that the parties otherwise reached an antecedent agreement to arbitrate issues such as plaintiffs' claim that the 2022 Agreement (as distinct from the class action waiver in particular) is unconscionable. Plaintiffs' claim that there is any contradiction among these terms is unreasonable.

Thus, unless plaintiffs can establish that the delegation clause in particular is unconscionable, they must proceed to arbitration because they agreed to arbitrate not only the claim asserted here but also antecedent issues of arbitrability, such as their unconscionability defense.

//

//

**B. The Delegation Clause Is Not Unconscionable.**

When parties delegate arbitrability issues to the arbitrator, the court decides only the conscionability or unconscionability of the delegation clause and not a challenge to the agreement as a whole. (*Tiri*, *supra*, 226 Cal.App.4th at p. 244, citing *Rent-A-Center*, *supra*, 561 U.S. at pp. 70–74.) Ignoring that limitation, plaintiffs focus almost exclusively on terms other than the delegation clause, particularly the severable mass arbitration provision. (Opp. at p. 8:7–20.) They state "Uber's delegation clause is unconscionable because the 'mass arbitration' provisions and special master process (a) delay resolution of the agreement's validity until the special master decides myriad issues; (b) control 'the timing and/or sequence' of arbitrations; (c) impugn drivers' choice of counsel; and (d) are asymmetrical." (Opp. at p. 8:17–20.) In the court's view, although plaintiffs attempt to frame their points as relating to the delegation clause, their arguments exceed the permissible scope of the unconscionability defense to be considered by the court under *Rent-A-Center.* (See, e.g., *Tiri*, *supra*, 226 Cal.App.4th at pp. 247–48.) Out of an abundance of caution, the court addresses and rejects these arguments, having already discussed *Heckman* and the mass arbitration provision in connection with plaintiffs' other arguments, above. Plaintiffs fail to carry their burden of establishing unconscionability based on the existing record and because they do not present sufficient evidence to support their argument, choosing to rely on facts not in evidence and solely introducing inadmissible hearsay in the declaration of Bryan Weir for the truth of the matter asserted about how long it would take AAA to appoint an arbitrator for 8,000 individual arbitrations. (See *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US),* LLC (2012) 55 Cal.4th 223, 247; *Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1243.)

To avoid enforcement of a contract based on unconscionability, the contract must be both procedurally and substantively unconscionable. (*Armendariz v. Found. Health Psychcare Servs., Inc.* (2000) 24 Cal.4th 83, 114.) Procedural unconscionability may arise from oppression or surprise due to unequal bargaining power, while substantive unconscionability may be found where the terms of the agreement itself (as distinct from how it was formed) are overly harsh or one-sided. (*Ibid.*) "A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125; accord *Fuentes v. Empire Nissan, Inc.* (2026) 19 Cal.5th 93, 102–103.)

"A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' (*Armendariz*, *supra*, 24 Cal.4th at p. 113.)" (*OTO*, *supra*, 8 Cal.5th at p. 126.) "An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' [Citations.]" (*OTO*, *supra*, 8 Cal.5th at p. 126.) "Arbitration contracts imposed as a condition of employment are typically adhesive. . . ." (*Ibid.*) If there is a contract of adhesion, "[t]he pertinent question, then, is whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required. (*Ibid.*) "*Oppression* occurs where a contract involves lack of negotiation and meaningful choice, *surprise* where the allegedly unconscionable provision is hidden within a prolix printed form." (*Ibid.* [internal citations and quotation marks omitted].) " 'The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney.' (*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.* (2015) 232 Cal.App.4th 1332, 1348.)" (*OTO*, *supra*, 8 Cal.5th at pp. 126–27.)

Plaintiffs did not file declarations or present any evidence of oppression. The court succinctly addresses each of the prerequisites of procedural unconscionability and concludes that none of them are satisfied, specifically with respect to the delegation clause.

Uber's evidence shows that the 2022 Agreement is a standard form of agreement. And the court infers for the sake of argument that Uber, as the platform operator, is the party with superior bargaining power. Even so, the 2022 Agreement does not bear all the hallmarks of a contract of adhesion and is dissimilar from adhesive employment agreements in which consent to an arbitration agreement is a *condition of employment*. (See, e.g., *OTO*, *supra*, 8 Cal.5th at pp. 126–27.) There is a clearly labeled opt-out procedure in Section 13.8, which describes a straightforward process to opt out by sending an email to the address optout@uber.com stating the driver's intent to opt out and providing the driver's name, phone number associated with the driver's account, and city of residence. Plaintiffs' assertion that the opt-out provision is buried is inaccurate. They unpersuasively rely on a distinguishable case where the arbitration

agreement—which lacked an opt-out provision—was presented to a party about to undergo a medical procedure. (*Swain v. LaserAway Med. Group, Inc.* (2020) 57 Cal.App.5th 59.)

There is no other basis for finding procedural unconscionability. Plaintiffs could consider the 2022 Agreement on their own schedule, aided by anyone, including an attorney. Plaintiffs were not pressured to sign the 2022 Agreement at, for example, a rushed on-site orientation or in the presence of an Uber representative. Nor were they discouraged from exercising the opt out after signing the 2022 Agreement. While plaintiffs state the 2022 Agreement is presented to vulnerable individuals facing temporal and financial pressure, they present no supporting evidence as to themselves or putative class members.

In sum, the evidence presented by Uber—which plaintiffs do not attempt to rebut with any evidence—does not support a finding of procedural unconscionability.

As for substantive unconscionability, plaintiffs focus entirely on the mass arbitration provision, largely ignore the pertinent standard and the delegation clause itself, and attempt to rely on facts—such as whether there are 80,000 putative class members with similar claims—**that are nowhere in the record before the court.**

To begin, plaintiffs read the 2022 Agreement as conferring on the special master the "ability to decide the 'timing and/ or sequence' of arbitrations." (Opp. at p. 9:13–14) From that premise, plaintiffs anticipate the special master will artificially and unfairly limit the number of arbitrations that can proceed. However, the 2022 Agreement does not create that obstacle to due process. If a party requests the appointment, the special master may resolve other non-merits disputes about "efficient initial case management of the mass arbitration demands, including, but not limited to, the timing and/or sequence *of payment of any remaining filing or administrative fees or costs related to the mass arbitration demands*." (2022 Agr., § 13.3(h)(10), italics added.) Plaintiffs do not substantiate their claim that the special master could set up a bellwether process. And there is no basis for finding that the special master could proceed in a manner similar to what was at issue in *Heckman*.

Plaintiffs also fear undue delays and cite to another trial court decision, *Pandolfi v. AviaGames, Inc.* (N.D. Cal., Sept. 4, 2024, No. 23-CV-05971-EMC) 2024 WL 4051754[3], to predict that the procedure for mass demands will indefinitely and impermissibly retard resolution of threshold questions, such as the enforceability of the arbitration agreement, and, thus, render the delegation clause unconscionable. The facts in *Pandolfi* are distinguishable from those presented here. (See, e.g., *Carolus v. Coinbase Global, Inc.* (N.D. Cal. Oct. 7, 2025, No. 25-CV-03089-CRB) 2025 WL 3033736 [distinguishing *Pandolfi* and explaining operation of AAA Mass Arbitration Supplementary Rules].) Their sole opposition evidence is a hearsay declaration of Bryan Weir about irrelevant circumstances in another case which the court disregards. The delay, if any, is attributable to a law firm's decision to present multiple claims simultaneously not to the mass arbitration procedures, which permissibly provide necessary structure to address arbitration demands efficiently. There is no basis for finding undue delay.

Next, plaintiffs argue that the mass arbitration provision, as applied to the delegation clause, "impugns" plaintiffs' choice of counsel because it can only be avoided by choosing a different lawyer. (Opp. at p. 10: 3–5.) Plaintiffs had the choice to opt out of the arbitration provision. Plaintiffs offer no evidence that their claims will trigger mass arbitration procedures. Nor is there a basis to conclude that the procedures will be triggered with sufficient regularity to support plaintiffs' argument about choice of counsel.

The court also rejects plaintiffs' final point that the mass arbitration provision is asymmetrical. That the mass arbitration provisions will not apply literally equally based on who typically pursues claims against whom does not establish that the mass arbitration provision is *inequitable*. Nor does any functional asymmetry support the conclusion that there is fundamental unfairness or one-sidedness. Even if the court credited plaintiffs' arguments, they do not relate to the conscionability of the **delegation clause**, particularly given the various severability provisions in the 2022 Agreement.

Plaintiffs' effort to link their arguments about the mass arbitration provision to a challenge to the delegation clause fails. The delegation clause is not unconscionable. Plaintiffs' unconscionability defense

[3] Plaintiffs also cite additional orders from the very same trial court that rely on *Pandolfi*, including *Rios v. HRB Digital LLC* (N.D. Cal. 2025) 807 F.Supp.3d 975 and *MacClelland v. Cellco Partnership* (2022) 609 F.Supp.3d 1024. These trial court orders are not binding.

to the 2022 Agreement as a whole is premised on the arguments the court rejects above. Those claims are expressly delegated to the arbitrator and therefore will not be addressed by the court.

### III. PLAINTIFFS MUST PROCEED TO ARBITRATION.

Plaintiffs do not challenge the formation of the 2022 Agreement, which includes an agreement to arbitrate their claims on an individual basis. Because plaintiffs fail to establish the delegation clause is unconscionable, they must proceed to arbitration where they may raise any antecedent disputes over the enforceability of the 2022 Agreement and their reverse discrimination claim under the Unruh Act.

## CONCLUSION

The motion to compel arbitration is **GRANTED**. This proceeding is **STAYED** during the pendency of the arbitration. The court **RESERVES** a further case management conference for **September 3, 2026, at 9:00 a.m.** with a joint statement due no later than **August 27, 2026,** confirming initiation of arbitration, the assigned arbitrator, and the date of the initial scheduling conference. If plaintiffs have not timely initiated arbitration, they must show cause—in lieu of a joint statement—by **August 27, 2026**, as to why this action should not be dismissed.

Dated: May 21, 2026

Jeffrey S. Ross

JEFFREY S. ROSS
Judge of the Superior Court

**CERTIFICATE OF ELECTRONIC SERVICE**
(CCP 1010.6 & CRC 2.251)

I, Sean Kane, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On May 21, 2026, I electronically served the attached document via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated: May 21, 2026

Brandon E. Riley, Court Executive Officer

By: ______________________
Sean Kane, Deputy Clerk